UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

WILLIAM WEINER and
ARTHUR BOGORAZ,

Defendants.

**MEMORANDUM
OPINION & ORDER**

22 Cr. 19 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Trial of Defendants Weiner and Bogoraz is scheduled for January 17, 2024.  (Dec.
12, 2024 Tr. (Dkt. No. 322) at 32)[1]  Weiner has moved for a severance (Dkt. No. 302), and in a
one-sentence letter, Bogoraz has moved "to join in the motion for severance."  (Dkt. No. 313)
Weiner has also moved to dismiss the operative (S3) Indictment for lack of specificity.  In the
alternative, Weiner seeks a bill of particulars.  (Dkt. No. 300)  For the reasons stated below,
Weiner's and Bogoraz's motion for a severance will be granted to the extent that the
Government intends to proceed on the (S3) Indictment.  Weiner's motion to dismiss or for a bill
of particulars will be denied.

## BACKGROUND

### I.   THE INDICTMENTS

Defendants Weiner and Bogoraz are charged in connection with a long-running
no-fault insurance fraud scheme.  The alleged fraud scheme involved using medical clinics (the

---

[1]  The page numbers of documents referenced in this order correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

"No-Fault Facilities") fraudulently controlled by the Defendants' co-conspirators[2] to bill insurance companies for unnecessary medical procedures.  (Indictment (Dkt. No. 1) ¶¶ 1-2)  The Government also alleges that the conspirators promoted the fraudulent scheme by paying "hundreds of thousands of dollars" in bribes to "911 operators, hospital employees, and others . . . for confidential motor vehicle accident victim information."  (Id. ¶ 3)  The confidential information unlawfully obtained was then used to contact the accident victims and induce them to seek treatment at corrupt medical clinics controlled by the conspirators.  (Id.)

A.     **The Initial Indictment**

The initial indictment in this case (the "Indictment") is a twenty-page "speaking indictment" that describes the alleged no-fault insurance fraud scheme in great detail.  The Indictment's allegations make clear that, among other things, the conspirators' use of bribery to obtain the confidential information of motor vehicle accident victims was intimately related to their use of the No-Fault Facilities to fraudulently bill insurance companies.  The Indictment also contains detailed allegations about the respective roles of Weiner and Bogoraz in the fraud scheme.

The Government provides an "overview" of the alleged illegal scheme at the outset of the Indictment:

> 1. From at least in or about 2008 up to and including in or about 2021, BRADLEY PIERRE, MARVIN MOY, WILLIAM WEINER, ANDREW PRIME, and ARTHUR BOGORAZ (the "Pierre Conspirators" or the "Conspirators"), the defendants, and others known and unknown, participated in a criminal scheme to exploit insurance programs designed to protect motor vehicle accident victims (the "No-Fault Scheme").

---

[2]  In New York, any medical clinic seeking reimbursement under the no-fault insurance law must be owned and operated by a licensed physician.  In the charged conspiracy, the Government alleges that the No-Fault Facilities were fraudulently controlled by non-physicians.  (Indictment (Dkt. No. 1) ¶¶ 5-6)

2. As part of the No-Fault Scheme, the Pierre Conspirators fraudulently owned and controlled five medical professional corporations – including clinics and an MRI facility – by paying licensed medical professionals to use their licenses to incorporate the professional corporations (collectively, the "No-Fault Facilities" or the "Facilities").  The Pierre Conspirators further defrauded automobile insurance companies by billing insurance companies for unnecessary and excessive medical treatments, falsifying clinical findings of injuries in MRIs, and lying under oath to insurance company representatives.

3. The Pierre Conspirators promoted the scheme through bribery.  The Pierre Conspirators paid hundreds of thousands of dollars to co-conspirators (the "Runners"), who used this money [to] pay bribes to 911 operators, hospital employees, and others (collectively, the "lead sources") for confidential motor vehicle accident victim information.  The Runners then used this information to contact automobile accident victims, lie to them, and induce them to seek medical treatment at, among other places, the No-Fault Facilities.

4. The Pierre Conspirators laundered the proceeds of the fraud through phony lending agreements, check-cashing entities, and shell companies.  All told, the Pierre Conspirators billed insurance companies for more than $70 million in fraudulent medical treatments.

(Indictment (Dkt. No. 1) ¶¶ 1-4)[3] (emphasis in original)

The Indictment then explains the regulatory scheme for no-fault automobile insurance in New York which – as noted above – includes the requirement that any medical clinic seeking reimbursement under the no-fault insurance law be "incorporated, owned, operated, and/or controlled by a licensed medical practitioner" (Id. ¶¶ 5-6)

The Indictment next explains the role of each named "Pierre Conspirator." As to Bradley Pierre, the Government alleges that although he is not a licensed medical practitioner, he

> owned, operated, and controlled the No-Fault Facilities that engaged in the fraudulent billing for unnecessary and excessive medical treatment under the No-

---

[3]  While Bogoraz is identified as a conspirator for purposes of the healthcare fraud conspiracy charged in Count One (see id. ¶ 1), his name is not included in the statutory allegation at the close of that count.  (See id. ¶¶ 27-28)

Defendants Bradley Pierre and Prime have pleaded guilty.  (Dec. 18, 2023 Minute Entries, United States v. Pierre et al, No. 22 Cr. 19)  Defendant Moy is a fugitive.  (June 26, 2023 Arrest Warrant (Dkt. No. 192))

Fault Law, and falsified findings of clinical injury in MRIs.  PIERRE engaged in multiple types of money laundering to conceal the proceeds of the No-Fault Scheme and financed a widespread bribery and kickback scheme to bring patients into the facilities.

(Id. ¶ 7) (emphasis in original).

The Indictment goes on to allege that Defendants Marvin Moy and William Weiner are corrupt physicians who participated in the fraud scheme in the following manner:

The No-Fault Doctors: The No-Fault Doctors incorporated the medical clinics that conducted initial evaluations of Patients and prescribed specialized care such as prescription pharmaceuticals, durable medical equipment, and MRIs ("the No-Fault Clinics").  The No-Fault Doctors include, among others, MARVIN MOY, the defendant, who incorporated the medical clinic Rutland Medical PC ("Rutland") as part of the scheme.  MOY conducted unnecessary and excessive medical treatments under the No-Fault Law.

The Specialists:  The Specialists are licensed physicians who conducted the specialized medical care prescribed by the No-Fault Clinics, such as MRIs and X-rays.  The Specialists include, among others, WILLIAM WEINER, the defendant, who is a licensed doctor of osteopathy who incorporated the MRI facility Nexray Medical Imaging PC ("Nexray" or the "MRI Facility") as part of the scheme. WEINER falsified clinical findings of injury in MRI reports that were submitted to insurance companies.

(Id. ¶ 8) (emphasis in original).

After identifying "Personal Injury Attorneys" as another category of conspirators participating in the fraudulent scheme, the Indictment sets forth the following description of Defendant Bogoraz's role in the scheme:

ARTHUR BOGORAZ, the defendant, is a paralegal and manager at a New York-based personal injury law firm ("Law Firm-1").  BOGORAZ is not an attorney. However, BOGORAZ engaged in a quid pro quo whereby BRADLEY PIERRE, the defendant, sent patients from the No-Fault Facilities to Law Firm-1 for legal representation in return for BOGORAZ referring clients to the No-Fault Facilities for medical treatment.  In addition, BOGORAZ and PIERRE agreed to jointly pay bribes for patient and client referrals to the No-Fault Facilities and Law Firm-1.

(Id. ¶ 9) (emphasis in original).

Finally, the Indictment discusses the role of "Runners" – the individuals who paid

> bribes to employees or agents of hospitals, medical service providers, police officers and 911 operators employed by the New York Police Department ("NYPD"), and other entities (collectively, the "lead sources"). These lead sources in turn unlawfully disclosed the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere. After obtaining the confidential information of motor vehicle accident victims – which often included victims' names, contact information, and medical information – the Runners contacted the victims and made false representations to steer the victims to receive medical treatment or legal representation at the No-Fault Facilities, Law Firm-1, and other medical clinics and attorney's offices. ANDREW PRIME, the defendant, is a Runner [who] bribed 911 operators and operated a call center as part of the scheme.

(Id. ¶ 10) (emphasis in original).

After describing the role of each individual defendant, the Indictment explains at great length how the Defendants, including Weiner, exploited New York's insurance laws through the No-Fault Facilities:

### The Fraudulent No-Fault Facilities

12. In order to take advantage of the patient friendly provisions of the No-Fault Law, BRADLEY PIERRE, the defendant, recruited medical practitioners to open at least five No-Fault Facilities between in or about 2008 up to and including 2021. These Facilities fell into two groups: the No-Fault Clinics that conduct initial evaluations of Patients and prescribed specialized care, and the MRI Facility that provides medical imaging services.

13. The scheme began with the No-Fault Clinics. While purporting to be legitimate medical care clinics specializing in treating patients, the No-Fault Clinics were not owned, operated, and controlled by licensed medical practitioners as is required by law. Instead, BRADLEY PIERRE, the defendant, was the actual owner, operator, and controller of Clinics. For instance, PIERRE received the majority of the Clinics' proceeds and decided how much the nominal owners would be paid; possessed the checkbooks and pre-signed checks from the Clinic's bank accounts; controlled the debit and credit cards for the Clinics; controlled hiring and firing of the Clinic's employees; invested the initial funds to establish the Clinics; identified the locations for the Clinics; negotiated the rent for the Clinics' leases; and chose the attorneys that would represent the Clinics in arbitration, litigation, and sworn depositions before insurance companies.

. . . .

15. BRADLEY PIERRE, the defendant, profited every step of the way.  In addition to receiving the majority of the proceeds of the No-Fault Clinics, PIERRE required the No-Fault Clinics to refer Patients to a network of pharmacies, attorneys, and medical specialists handpicked by PIERRE for one reason - they paid PIERRE millions of dollars for illegal referrals.

16. Although BRADLEY PIERRE, the defendant, had a network of attorneys who paid kickbacks for patients - including Law Firm-1 - PIERRE principally steered patients to a personal injury law firm owned by a family member ("Law Firm-2").  PIERRE conducted much of the No-Fault Scheme from his physical office located in Law Firm-2, where among other things he monitored the No-Fault Clinics using closed circuit TV cameras, communicated with co-conspirators using the Firm's email domain, and met with the No-Fault Doctors in Law Firm-2's offices.

. . . .

17. BRADLEY PIERRE, the defendant, further profited by steering hundreds of Patients from the Clinics to Nexray, the MRI Facility under PIERRE's control.  Like the Clinics, Nexray purported to be operated and controlled by a licensed physician – WILLIAM WEINER, the defendant.  In practice, however, PIERRE received the majority of Nexray's proceeds; controlled Nexray's bank accounts; influenced the hiring and firing of Nexray's employees; identified the locations for Nexray's facilities; negotiated the rent for Nexray's leases; and chose the attorneys that would represent Nexray in arbitration, litigation, and sworn depositions before insurance companies.  PIERRE further arranged for a network of no-fault doctors and attorneys to refer patients to Nexray for medical care - oftentimes through bribery - in addition to the No-Fault Clinics under his control.

18. In order to boost these referrals, BRADLEY PIERRE and WILLIAM WEINER, the defendants, agreed to falsify clinical findings of injuries on MRI reports and pressure radiologists working for Nexray to exaggerate findings of injuries in their own reports.  These false clinical findings, in turn, allowed referring physicians and attorneys to bill for additional benefits under the No-Fault Law and obtain larger legal settlements and judgments.

(Id. ¶¶ 12-18) (emphasis in original).

       Finally, the Indictment explains the central role that bribery played in the alleged fraudulent scheme, including Defendant Bogoraz's bribery-related activities:

<u>Bribery</u>

23.  The No-Fault Scheme depended on the No-Fault Facilities receiving a steady supply of motor vehicle accident victims.

24.  As part of the scheme, BRADLEY PIERRE and ARTHUR BOGORAZ, the defendants, arranged for the Runners, including ANDREW PRIME, the defendant, to bribe employees or agents of public and private institutions, including hospitals and the NYPD, to unlawfully disclose the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere.

25.  After obtaining the confidential information of motor vehicle accident victims, the Runners contacted the victims and made false representations in order to steer victims to receive medical treatment from the No-Fault Facilities, and legal representation from Law Firm-1 and Law Firm-2.

26.  BRADLEY PIERRE, the defendant, paid the Runners approximately $1,500 to $3,000 per successful "referral" to a No-Fault Clinic, $700 to $1,500 per successful "referral to Law Firm-2, and $150 per successful "referral to Nexray. ARTHUR BOGORAZ, the defendant, likewise paid the Runners $700 to $1,500 per successful referral to Law Firm-1.  The Runners then took a portion of the kickbacks for themselves and funneled the rest of the money to the lead sources that provided the confidential information.

(<u>Id.</u> ¶¶ 23-26) (emphasis in original).

The Indictment charges (1) Bradley Pierre, Moy, and Weiner with conspiracy to commit healthcare fraud in Count One; and (2) Bradley Pierre, Andrew Prime, and Bogoraz with conspiracy to commit Travel Act bribery in Count Three.  (<u>Id.</u> ¶¶ 27-28, 32-34)  Count Two charges Bradley Pierre, Moy, and Weiner with conspiracy to commit money laundering by conducting financial transactions designed to disguise the "nature, location, source, ownership, and control of the proceeds" of the healthcare fraud described in Count One.  (<u>Id.</u> ¶¶ 29-31)

**B.    The (S2) Indictment**

The Government obtained the twenty-one page (S2) Indictment on June 26, 2023.

The (S2) Indictment, <u>inter alia</u>:  (1) repeats the factual allegations and charges found in the first

indictment; (2) adds Jean Pierre as a defendant; and (3) adds a tax fraud conspiracy count against

Weiner, Bradley Pierre, and Jean Pierre.  (S2 Indictment (Dkt. No. 191))

The tax fraud conspiracy count includes the following allegations:

In addition, from at least in or about 2016, up to and including in or about 2020, BRADLEY PIERRE, JEAN PIERRE, and WILLIAM WEINER, the defendants, conspired to defraud the United States by filing false corporate tax returns.  As part of the tax scheme, BRADLEY PIERRE, JEAN PIERRE, and WEINER agreed to falsely overstate business expenses and falsely underreport profits associated with the health care fraud and money laundering schemes to the IRS. BRADLEY PIERRE, JEAN PIERRE, and WEINER facilitated the scheme through a common accountant shared by all three men, "CC-1," who was a knowing and willful participant in the conspiracy.  The PIERRE brothers and Weiner, among other things, facilitated the scheme using bank accounts opened and located in the Southern District of New York.  In total, BRADLEY PIERRE, JEAN PIERRE, and WEINER conspired to overstate expenses or underreport profits of at least $4 million.  For example:

a.  BRADLEY PIERRE: BRADLEY PIERRE, the defendant, utilized his companies, MRC and M4Y, to enter into phony financing arrangements with MARVIN MOY and WILLIAM WEINER, the defendants.  In order to "justify'" this so-called funding relationship, from at least in or about 2016, up to and including in or about 2020, BRADLEY PIERRE, MOY, and WEINER conspired to falsely over-report the No-Fault Clinics' expenses on tax returns so that the Clinics would look as if they suffered from insufficient cash flow to operate.  This agreement to falsely over-report expenses further served to decrease the Clinics' tax payments due to the IRS.

. . . .

f.  WILLIAM WEINER:  WEINER conspired to falsely over-report Nexray's expenses on U.S. Income Tax Returns for S Corporation, forms 1120S, so that the facility would look as if it suffered from insufficient cash flow to operate.  He did this by signing returns prepared by CC-1 that he knew included over-inflated management fees that were directed by BRADLEY PIERRE, the defendant.  This agreement to falsely over-report expenses further served to decrease Nexray's taxable income, which ultimately decreased WEINER's personal taxable income as well.  Additionally, WEINER conspired to deduct personal expenses as business expenses on Nexray's Forms 1120S for tax years 2017 through 2019, further reducing Nexray's taxable income.  He did this by knowingly directing CC-1 to improperly deduct these expenses on his tax returns.  In addition, WILLIAM WEINER, the defendant, caused CC-1 to falsely declare on tax returns that certain funds WEINER received from Nexray were shareholder distributions and not taxable income.

8

(Id. ¶ 28) (emphasis in original).

The S2 Indictment includes the following table detailing the "overstated management fees" and personal expenses fraudulently reported on Nexray's corporate tax returns:

| | | False Deductions | | | |
|---|---|---|---|---|---|
| Tax Year | Overstated "Management Fees" | Golf Course Payments | Car Payments | Payments Toward Personal Credit Card | Total |
| 2017 | $127,873.37 | $23,642.90 | $13,076.32 | $11,529.79 | $176,122.38 |
| 2018 | $249,675.28 | $53,065.26 | $13,560 | $6,808.53 | $323,109.07 |
| 2019 | | $36,282.63 | $11,665.54 | $828.56 | $48,776.73 |
| Total | $377,548.65 | $112,990.79 | $38,301.86 | $19,166.88 | $548,008.18 |

(Id.)

## C.   The (S3) Indictment

The Government obtained the (S3) Indictment on December 6, 2023.  The (S3) Indictment:  (1) narrows the timeframe of the charged healthcare fraud conspiracy from 2008 to 2021 to 2015 to 2021; (2) splits the previously charged money laundering conspiracy count into two separate money laundering conspiracy counts, with healthcare fraud as the specified unlawful activity in one count, and bribery as the specified unlawful activity in the other; (3) names Bogoraz as a defendant in the money laundering conspiracy count premised on bribery; and (4) adds a substantive healthcare fraud count against Bradley Pierre and Weiner.  ((S3) Indictment (Dkt. No. 282))

The (S3) Indictment is not a "speaking indictment," does not contain the detailed factual allegations set forth in the first two indictments, and merely tracks the necessary statutory language.  (Id.)  The Government has represented on multiple occasions, however, that it intends to prove up at trial the factual allegations concerning Weiner and Bogoraz that are set forth in the

Indictment and the S2 Indictment.[4]  (Govt. Dec. 1, 2023 Ltr. (Dkt. No. 275); Dec. 12, 2023 Tr.

(Dkt. No. 322) at 15)  Moreover, the (S3) Indictment did not require the Government to produce

any additional Rule 16 discovery.  (See Govt. Dec. 1, 2023 Ltr. (Dkt. No. 275)).

## II.   THE GOVERNMENT'S PRE-TRIAL DISCLOSURES, AND WEINER'S PRIOR MOTION TO DISMISS AND REQUEST FOR A BILL OF PARTICULARS

The Government's pretrial disclosures in this case have been extraordinary.  Most

of the Rule 16 discovery was provided by July 2022, a year and a half ago.  (July 18, 2022 Conf.

Tr. (Dkt. No. 99) at 4-5)  The Government took the highly unusual – and not statutorily required

– step of disclosing to the Defendants the Section 3500 material of "35 to 40 witnesses" expected

to testify at trial.  (Id. at 5); see 18 U.S.C. § 3500.  Accordingly, since July 2022, Weiner and

Bogoraz have been in possession of not only the Rule 16 discovery relevant to the charges

against them but also the Section 3500 material of many of the witnesses expected to testify at

trial.

Notwithstanding these disclosures – and notwithstanding the painstaking factual

detail set forth in the original Indictment (and repeated in the (S2) Indictment) – on October 18,

2022, Weiner moved to dismiss the Indictment for lack of specificity and to request, in the

alternative, a bill of particulars.  (Dkt. No. 106)

In opposing Weiner's motion to dismiss, the Government summarized the

disclosures that it had made to Weiner as follows:

> In March 2022 . . . the Government voluntarily produced statements of
> approximately 34 trial witnesses.  The same month, on or about March 25, 2022,
> the Government met with Weiner's counsel in person and discussed the
> allegations against Weiner in length. The Government detailed the facts and
> evidence against Weiner, pointed counsel to portions of the discovery relevant to

---

[4]  The Government has not explained why it deleted – in the (S3) Indictment – the extensive
factual allegations set forth in the Indictment and in the (S2) Indictment.

Weiner, and discussed several of the witnesses who would testify against Weiner at trial.

Approximately two weeks later, on or about April 13, 2022, the Government made early disclosure of expert testimony by Dr. Scott Coyne. Dr. Coyne's 24-page report detailed how Dr. Coyne randomly selected MRI reports prepared by Weiner for 40 different patients (the "Initial Report"). The Initial Report also detailed how Dr. Coyne found that Weiner's MRI reports either falsely reported patient injuries or failed to describe important underlying degenerative conditions as the cause of radiologic findings, which would mislead the referring physician to erroneously assume that the injuries were the result of trauma.

The same month, on or about April 27, 2022, Weiner's counsel sent a letter (the "April Letter") thanking the Government for "partial production of witnesses statements and reports" and for having "met with us to discuss discovery issues." The April Letter then made a host of additional inquiries regarding the Government's case. The Government responded on May 16, 2022, with additional information, including a non-exhaustive, two-page list of false statements that Weiner made during Examinations under Oath ("EUOs").

The next month, on or about June 20, 2022, the Government met with Weiner's counsel in person and again discussed the Government's case against Weiner at length. The Government afterwards voluntarily produced statements of another eight trial witnesses in September 2022, and made a supplemental expert disclosure on or about November 15, 2022. In the 33-page supplemental report (the "Supplemental Report"), Dr. Coyne detailed how he had randomly selected another 60 MRI reports prepared by Weiner and found the same pattern of false reporting of patient injuries or failures to describe important underlying degenerative conditions. as the cause of radiologic findings, which would mislead the referring physician to erroneously assume that the injuries were the result of trauma.

(Govt. Jan. 19, 2023 MTD Opp. (Dkt. No. 142) at 28-30)

        At oral argument concerning Weiner's October 2022 motion to dismiss, the Court "direct[ed] the Government to provide to the Court all of the documentary information it allegedly turned over to Dr. Weiner's counsel," so that the Court could assess whether the Government had disclosed the material it claimed to have disclosed. (Apr. 28, 2023 Tr. (Dkt. No. 162) at 21) The Government provided this information to the Court, and the Court determined that the documents "match[ed] the Government's description in its opposition brief." (Oct. 24, 2023 Opinion (Dkt. No. 253) at 60-61)

After concluding that the disclosures to Weiner matched the Government's representations, the Court denied Weiner's October 2022 motion to dismiss the indictment and request for a bill of particulars.  (Id.)

## DISCUSSION

Weiner has moved to dismiss the (S3) Indictment for a lack of specificity.  In the alternative, Weiner seeks a bill of particulars.  (Dkt. No. 300)  Weiner has also moved for a severance from Bogoraz.  (Dkt. No. 302)  Bogoraz has joined in Weiner's motion for a severance.  (Dkt. No. 313)

## I.   MOTION FOR SEVERANCE

Weiner contends that he is entitled to a severance because he and Bogoraz are improperly joined in the (S3) Indictment, given that they "do not face any common charges" and that the (S3) Indictment "does not allege any facts to show that the charges against them arise out of a common plan or scheme."  (Weiner Sever. Br. (Dkt. No. 303) at 1; Weiner Sever. Reply (Dkt. No. 325))  Weiner further argues that, even if severance is not mandatory, this Court should "grant a discretionary severance under Rule 14 because . . . the benefits of a joint trial are de minimis and the potential for prejudice is high."  (Weiner Sever. Br. (Dkt. No. 303) at 6)

### A.   Applicable Law

#### 1.   Rule 8 Joinder

Rule 8(b) of the Federal Rules of Criminal Procedure addresses the joinder of defendants:

> **Joinder of Defendants.**  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b) (emphasis in original).

The Second Circuit has summarized the law regarding joinder as follows:

> Rule 8(b) allows joinder of two or more defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses." Fed.R.Crim.P. 8(b). We have interpreted the "same series of acts or transactions" language of Rule 8(b) to mean that "joinder is proper where two or more persons' criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'" United States v. Cervone, 907 F.2d 332, 341 (2d Cir.1990) (quoting [United States v.] Attanasio, 870 F.2d [809,] 815 [2d Cir. 1989]). In this context, we also "apply a 'commonsense rule' to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." [United States v.] Shellef, 507 F.3d [82,] 98 [2d Cir. 2007] (citing United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988)).

United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008).

Joinder may thus be appropriate even where – as here – a defendant is not charged in a conspiracy count that names co-defendants. Id. (citing United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003). Joinder is also proper where "a reasonable person would easily recognize the common factual elements" in two separate charges. United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988). For example, where "one scheme stem[s] from the other," that link "provides a sound basis for joinder under Rule 8(b)." Id. Similarly, "counts might be 'connected' if one of the offenses 'depend[s] upon [ ]or necessarily l[eads] to the commission of the other,' or if proof of one act 'constitute[s][ ]or depend[s] upon proof of the other.' Shellef, 507 F.3d at 98 (quoting United States v. Halper, 590 F.2d 422, 429 (2d Cir. 1978)) (alterations in Shellef). Finally, where two charged conspiracies are "intertwined," they are sufficiently related to justify joinder. Attanasio, 870 F.2d at 815.

The Second Circuit has further instructed that the propriety of joinder "turns on what is 'alleged' in the 'indictment,'" and not on the evidence that is adduced at trial. Rittweger, 524 F.3d at 178 (quoting Fed. R. Crim. P 8(b)). The Second Circuit has also stated in dicta that

"the plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations [by the Government about what the evidence will show that are] not contained in the indictment." Rittweger, 524 F.3d at 178 n.3. District courts in the Second Circuit have consistently applied Rittweger's "caution" that the propriety of joinder under Rule 8(b) is determined on the basis of the indictment's factual allegations. See United States v. Jordan, 629 F. Supp. 3d 49, 58 (E.D.N.Y. 2022) (quoting Rittweger's admonition that the "decision to join parties turns on what is alleged in the indictment"), United States v. Rajaratnam, 753 F. Supp. 2d 299, 306 (S.D.N.Y. 2010) (determining propriety of joinder by analyzing "whether the counts against [the defendants], as described in the language on the face of the Indictment, "'are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme'" (emphasis in original) (quoting Cervone, 907 F.2d at 341)).

There is a circuit split concerning the issue of whether a court can look beyond the indictment in determining whether joinder is appropriate under Rule 8(b). The D.C. Circuit, the Third Circuit, and the Eleventh Circuit have held that courts can consider material outside an indictment. See United States v. Halliman, 923 F.2d 873, 883 (D.C. Cir. 1991) ("In this circuit, however, the government need not demonstrate the propriety of its joinder decisions on the face of the indictment. Rather, the government need only present evidence before trial that each defendant participated in the series of acts underlying each offense charged (though not necessarily in every act making up the series)." (citation omitted)); United States v. McGill, 964 F.2d 222, 242 (3d Cir. 1992) ("Trial judges may look beyond the face of the indictment to determine proper joinder in limited circumstances. Where representations made in pretrial documents other than the indictment clarify factual connections between the counts, reference to those documents is permitted."); United States v. Dominguez, 226 F.3d 1235, 1241 (11th Cir.

2000) ("It is enough that when faced with a Rule 8 motion, the prosecutor proffers evidence which will show the connection between the charges.").

Five other circuits have ruled that the joinder determination must be premised on the allegations in an indictment. United States v. Kaufman, 858 F.2d 994, 1003 (5th Cir. 1988) ("The propriety of Rule 8 joinder is determined by the initial allegations of the indictment . . . ."); United States v. Chavis, 296 F.3d 450, 456 (6th Cir. 2002) ("Whether joinder was proper under Rule 8(a) is determined by the allegations on the face of the indictment."); United States v. Coleman, 22 F.3d 126, 134 (7th Cir. 1994) ("Rule 8 joinder is based solely on the face of the indictment. . . ."); United States v. Wadena, 152 F.3d 831, 848 (8th Cir. 1998) ("An indictment must reveal on its face a proper basis for joinder."); United States v. Terry, 911 F.2d 272, 276 (9th Cir. 1990) ("Because Rule 8 is concerned with the propriety of joining offenses in the indictment, the validity of the joinder is determined solely by the allegations in the indictment.").

### 2.    **Analysis**

Weiner does not dispute that the facts alleged in the original Indictment or the (S2) Indictment[5] are sufficient to justify joinder under Rule 8.[6]  Indeed, as discussed above, both of those indictments – which were in place for nearly all of the two-year history of this case – explain in great detail Weiner and Bogoraz's roles in the no-fault insurance fraud scheme, and the interdependent nature of the charged healthcare fraud and Travel Act bribery conspiracies in which they allegedly participated.

---

[5]  Weiner confusingly cites to the "Second Superseding Indictment."  (Weiner Sever. Br. (Dkt. No. 303) at 1)  The operative indictment – and the indictment that Weiner challenges – is the (S3) Indictment.

[6]  Weiner says that severance is now necessary "as a result of two recent developments" – the (S3) Indictment and the guilty pleas of Bradley and Jean Pierre.  (Weiner Sever. Br. (Dkt. No. 303) at 1)

As alleged in the Indictment, the no-fault insurance fraud scheme demanded that the no-fault medical clinics such as Nexray – the MRI facility at which Weiner worked – and the law firm at which Bogoraz worked, "receiv[e] a steady supply of motor vehicle accident victims." (Indictment (Dkt. No. 1) ¶¶ 9, 23-24)  To ensure a steady supply of victims, Bogoraz and Bradley Pierre allegedly "arranged for the Runners . . . to bribe employees or agents of public and private institutions, including hospitals and the NYPD, to unlawfully disclose the protected, confidential information of tens of thousands of motor vehicle accident victims."  (Id. ¶ 24)  Bogoraz "paid the Runners $700 to $1,500 per successful referral to Law Firm-1," and "engaged in a quid pro quo whereby" Bradley Pierre "sent patients from the No-Fault Facilities to Law Firm-1 for legal representation in return for BOGORAZ referring clients to the No-Fault Facilities for medical treatment."  (Id. ¶¶ 9, 26) (emphasis in original)

The Indictment further alleges that Bradley Pierre "steer[ed] hundreds of Patients from the [No-Fault] Clinics to Nexray, the MRI Facility under PIERRE's control," even though "Nexray purported to be operated and controlled by a licensed physician," namely Weiner.  (Id. ¶ 17)  To increase the number of these referrals, Weiner and Bradley Pierre "agreed to falsify clinical findings of injuries on MRI reports," which in turn "allowed referring physicians and attorneys to bill for additional benefits under the No-Fault Law and obtain larger legal settlements and judgments."  (Id. ¶ 18)  The (S2) Indictment repeats all of these factual details. (Dkt. No. 191)

Based on the factual allegations set forth in the Indictment and in the (S2) Indictment, it is clear that the conspiracy to bribe hospital employees and NYPD personnel to disclose the confidential information of motor vehicle accident victims is inextricably intertwined with the charged healthcare fraud conspiracy.  See Attanasio, 870 F.2d at 815.

16

Indeed, the charged healthcare fraud conspiracy – in which Weiner was allegedly a central figure – could not have existed without the bribery conspiracy – in which Bogoraz was allegedly a central figure – because the steering of accident victims to the corrupt medical clinics and corrupt law firms was only possible as a result of the bribes that had been paid to hospital employees and NYPD personnel.  Accordingly, joinder was appropriate for purposes of the Indictment and the (S2) Indictment – as Weiner acknowledges.  (Weiner Sever. Br. (Dkt. No. 303) at 1)

   As discussed above, the (S3) Indictment is not a speaking indictment, and it does not contain any of the extensive factual allegations set forth in the earlier indictments that show the intertwined nature of the healthcare fraud and bribery conspiracies.  Quoting <u>Rittweger</u> for the proposition that "'the plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations not contained in the indictment,'" (Weiner Sever. Reply Br. (Dkt. No. 325) at 2 (quoting <u>Rittweger</u>, 524 F.3d at 178 n.3), Weiner argues that joinder is not proper for purposes of the (S3) Indictment, because the (S3) Indictment does not contain factual allegations showing the interrelated nature of the healthcare fraud and bribery conspiracies.  (<u>Id.</u>)

   In its opposition brief, the Government does not address Weiner's argument that – under <u>Rittweger</u> and case law from five other circuits – the basis for joinder must be clear from the face of the indictment.  Accordingly, in a January 9, 2024 order, this Court directed the Government to address this case law.  (Dkt. No. 351)

   In a January 10, 2024 letter, the Government says that the issue of whether this Court can consider an earlier indictment in determining whether joinder in a superseding indictment is proper "is a matter of first impression."  (Govt. Jan. 10, 2024 Ltr. (Dkt. No. 355) at 1)  The Government goes on to argue that consideration of an earlier indictment is appropriate,

because a superseding indictment does not "'dispose of'" an earlier indictment.  (Id. (quoting United States v. Strewl, 99 F.2d 474, 477 (2d Cir. 1938)))  The Government further argues that, in any event, the (S3) Indictment contains sufficient factual allegations to justify joinder because – in the aggravated identity theft charge against Bradley Pierre (Count Six) – the Government alleges that "'during and in relation to the healthcare fraud conspiracy charged in Count One, [Pierre] caused Runners to bribe 911 operators, hospital employees, and others for the names and phone numbers [of] motor vehicle accident victims and use these unlawfully acquired means of identification to induce victims to seek medical treatment from the No-Fault Clinics.'"  (Id. at 2 (quoting (S3) Indictment (Dkt. No. 282) ¶ 11))

Acknowledging that the Indictment and the (S2) Indictment's extensive factual allegations are not the "pre-trial representations" that the Rittweger court had in mind, the Second Circuit expressed the view that – "[u]nder the plain language of Rule 8(b)" – the necessary factual allegations must be set forth in the indictment.  As discussed above, five other Circuits share that view, as do the district courts in this Circuit.  None of these decisions address whether factual allegations in an earlier indictment are sufficient to determine the propriety of joinder for purposes of a superseding indictment.  It is thus a novel issue whether the necessary factual allegations must be set forth in the indictment on which a defendant is tried, and this Court cannot predict how the Court of Appeals would rule.  Absent a determination of harmless error, improper joinder is reversible error.  See Attanasio, 870 F.2d at 815 ("[T]he propriety of Rule 8 joinder 'is subject to full appellate review,' and where 'joinder should not have been permitted, a conviction must be reversed, unless failure to sever was harmless error.'" (citation omitted) (quoting Turoff, 853 F.2d at 1042)).

The Government's arguments in its January 10, 2024 letter are not persuasive. While it is true that a superseding indictment does not dispose of an earlier indictment, the Government proposes to go to trial on the (S3) Indictment, which does not contain the factual allegations demonstrating the intertwined nature of the healthcare fraud and bribery conspiracies. And while the Government argues that the identity theft charge against Bradley Pierre in the (S3) Indictment fortuitously contains the necessary factual allegations, that charge does not mention Bogoraz in any fashion, and thus does not demonstrate that Weiner and Bogoraz are properly joined.  (See (S3) Indictment (Dkt. No. 282) ¶ 11)

Given (1) the dicta in Rittweger, district court decisions from this Circuit, and the decisions from five other circuits holding that a Rule 8(b) joinder determination must be premised on the factual allegations in an indictment; and (2) the fact that the operative indictment in this action does not contain factual allegations demonstrating that joinder of Weiner and Bogoraz is proper, this Court is constrained to conclude that the Government has not shown that Weiner and Bogoraz are properly joined in the (S3) Indictment.  Accordingly, the motion for a severance is granted to the extent that the Government wishes to proceed to trial on the (S3) Indictment.

## II.     MOTION TO DISMISS AND FOR A BILL OF PARTICULARS

Weiner argues that the (S3) Indictment, which is not a "speaking indictment," must be dismissed "because the allegations regarding his conduct lack the specificity required by the Fifth and Sixth Amendments to the United States Constitution."  (Weiner MTD Br. (Dkt. No. 301) at 1)  In the alternative, Weiner argues that the Court should require the government to provide a bill of particulars.  (Id.)

A.     **Applicable Law**

1.     **Motion to Dismiss**

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" United States v. Vilar, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1) (alterations omitted)).  "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)).  Thus, "to satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Id. (internal citation and quotation marks omitted).  "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363 (1956).

There is a "narrow category" of cases for which "specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." Stringer, 730 F.3d at 126 (citing Russell v. United States, 369 U.S. 749 (1962)).  Examples of such cases include "specification of what statements are alleged to be false, and in what respect they are false, in charges of criminal falsity," and the "type of controlled substance alleged to have been manufactured, distributed, dispensed, or possessed when charging under the controlled substances statute." Id. at 126-27 (citing United States v. Pirro, 212 F.3d 86 (2d Cir.

2000), and United States v. Thomas, 274 F.3d 655 (2d Cir. 2001)). But "there is no such universal requirement." Id. at 126.

Outside of that narrow category of cases, the Second Circuit has "'repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity.'" United States v. Walsh, 194 F.3d 37, 45 (2d Cir. 1999) (alterations in Walsh) (quoting United States v. McClean, 528 F.2d 1250, 1257 (2d Cir. 1976)). Dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).

Moreover, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial[,] the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." United States v. Perez, 575 F.3d 164, 166-67 (2d Cir. 2009) (quotation marks and alterations omitted).

### 2. Bill of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "'prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" United States v. D'Amico, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (quoting United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988)). The decision to grant or deny a bill of particulars "rests within the sound discretion of the district court." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).

"A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Gibson, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) (citing United States v.

Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995)).  "Instead, its purpose is to supplement the

facts contained in the indictment when necessary to enable defendants to identify with sufficient

particularity the nature of the charges against them."  United States v. Gotti, No. S4 02 CR

743(RCC), 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004) (citing Bortnovsky, 820 F.2d at 574);

accord United States v. Mandell, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) ("The standard for

determining whether a bill of particulars is appropriate is based on necessity . . . .").

   "Generally, if the information sought by defendant is provided in the indictment

or in some acceptable alternate form, no bill of particulars is required."  Bortnovsky, 820 F.2d at

574 (citations omitted).  "The Government d[oes] not[, however,] fulfill its obligation merely by

providing mountains of documents to defense counsel[,] who [a]re left unguided as to which

documents [the Government will use at trial]."  Id. at 575.

   Where a defendant seeks a bill of particulars, "the proper inquiry is not whether

the requested information would be helpful to the defense, but rather whether the information is

necessary to the defense."  United States v. Dupree, No. 10-CR-627 (KAM), 2011 WL 5976006,

at *6 (E.D.N.Y. Nov. 29, 2011) (emphasis in original) (citations omitted).  "It is well settled that

defendants need not know the means by which it is claimed they performed acts in furtherance of

the conspiracy nor the evidence which the Government intends to adduce to prove their criminal

acts."  United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d

Cir. 1989).

  **B.**  **Analysis**

   Weiner concedes that the charges in the (S3) Indictment "track the language of

the relevant statutes."  (Weiner MTD Br. (Dkt. No. 301) at 3)  He argues, however, that the (S3)

Indictment "does not provide constitutionally adequate notice" of the charges against him

because it "lacks the specificity required by the Fifth and Sixth Amendments to the United States Constitution." (Id. at 1-2)

Weiner made the same challenge to the Indictment and the (S2) Indictment, despite the extensive factual allegations that these charging instruments contain. (Oct. 24, 2024 Opinion (Dkt. No. 253) at 55, 60-61 & n.13) At oral argument on Weiner's earlier motion to dismiss, this Court noted that the Indictment is

> a speaking indictment, [which] explains in great detail – over 20 pages – the alleged fraudulent [n]o-[f]ault insurance scheme in which the Defendants allegedly engaged. The roles of each Defendant are explained in detail.
>
> . . . .
>
> [I]t appears . . . that the [I]ndictment informs Dr. Weiner of the "nature of the accusations against him," and that it provides him with "sufficient notice of the core of criminality to be proven against him." As to Dr. Weiner's complaints about the alleged lack of specificity in the Indictment, they do not appear persuasive to me.
>
> . . . .
>
> As to the failure of the [I]ndictment to list each MRI that Dr. Weiner falsified, each instance in which he pressured radiologists, and each lie he made during Examinations Under Oath, the short answer is that there is no requirement that an indictment go into that level of detail.

(Apr. 28, 2023 Tr. (Dkt. No. 162) at 18, 20-21 (quoting Russell v. United States, 369 U.S. 749, 766-67 (1962), and United States v. Pagan, 721 F.2d 24, 27 (2d Cir. 1983))). As noted above, the Government represents that it intends to prove at trial the factual allegations concerning Weiner that are set forth in the Indictment and in the (S2) Indictment. (Govt. Dec. 1, 2023 Ltr. (Dkt. No. 275); Dec. 12, 2023 Tr. (Dkt. No. 322) at 15).

In addition to the extraordinary amount of factual detail set forth in the Indictment and in the (S2) Indictment as to the nature and circumstances of Weiner's alleged crimes, he also has had the benefit of truly extraordinary pre-trial discovery on the Government's part. Since

July 2022 or before, Weiner has been in possession of not only the Rule 16 discovery relevant to the charges against him, but also the Section 3500 material for "35 to 40 witnesses" expected to testify at trial.  (July 18, 2022 Conf. Tr. (Dkt. No. 99) at 4-5)  The Government has also "met with Weiner's counsel in person" on multiple occasions to explain the charges against him and the associated evidence of his crimes; produced two expert reports that list the Weiner MRI reports that the Government intends to argue were falsified, along with an explanation as to how each MRI report was falsified; and provided a "two-page list of false statements that Weiner made during Examinations under Oath," during which Weiner allegedly perjured himself on the subject of who controlled Nexray Medical P.C.  (Govt. Jan. 19, 2023 MTD Opp. (Dkt. No. 142) at 28-30)

At oral argument on Weiner's original motion to dismiss or for a bill of particulars, the Court stated that,

> [i]f in fact [the] Government has made the disclosures it claims to have made, the breadth and timing of the discovery provided here far exceeds anything required under the Federal Rules of Criminal Procedure.
>
> . . . .
>
> [A]t this stage of the proceedings, the Government is not required to make an exhaustive presentation. . . . [and] assuming the Government's representations are true, the timing and breadth of discovery provided here has been quite extraordinary.  [This Court did not see discovery of this magnitude and detail] in nine years as a prosecutor in the [U.S. Attorney's Office] and [has not] seen anything like this in . . . 15 years . . . on the bench.

(Apr. 28, 2023 Tr. (Dkt. No. 162) at 21-23)  The Court then "direct[ed] the Government to provide to the Court all of the documentary information it allegedly turned over to Dr. Weiner's counsel."  (Id. at 21)  After reviewing this material and concluding that it matched the Government's representations, the Court denied Weiner's original motion to dismiss or for a bill of particulars.  (Oct. 24, 2023 Opinion (Dkt. No. 253) at 60-61).

For all the reasons cited above, and given the Government's representation that it intends to prove at trial the factual allegations concerning Weiner set forth in the Indictment and in the (S2) Indictment – even though these factual allegations are not set forth in the (S3) Indictment – Weiner's motion to dismiss or for a bill of particulars will be denied.

## **CONCLUSION**

For the reasons stated above, Defendant Weiner and Bogoraz's motion for a severance based on improper joinder is granted to the extent that the Government intends to proceed on the (S3) Indictment.  Weiner's motion to dismiss the (S3) Indictment or for a bill of particulars is denied.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 300, 302, 313).

Dated: New York, New York
         January 11, 2024

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge