UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | |
|---|---|
| - against - | ORDER |
| WILLIAM WEINER,<br>          Defendant. | 22 Cr. 19 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

In this no-fault insurance fraud case, the Government moves to preclude testimony from Defendant William Weiner's radiology expert, Dr. Bryan Pukenas. (Govt. Br. (Dkt. No. 331))  For the reasons stated below, the Court will conduct a Daubert hearing concerning Dr. Pukenas's proposed expert opinions.

## BACKGROUND

### I.    THE CHARGES AGAINST WEINER

Defendant Weiner is a radiologist charged in connection with a long-running no-fault insurance fraud scheme.  In the original indictment filed in January 2022, the Government alleges that Dr. Weiner and his co-defendants participated in a scheme to obtain the identity of motor vehicle accident victims via bribery, and then steer the accident victims to corrupt medical clinics, which falsely represented to insurers that they were owned and controlled by physicians, when in fact they were not.[1]  (Indictment (Dkt. No. 1))[2]  Weiner incorporated Nexray Medical

---

[1] Under New York law, only medical clinics owned and operated by physicians may submit claims for services provided under the no-fault insurance law.  See State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 321 (2005) (upholding New York State regulation permitting insurers to deny reimbursement for no-fault claims submitted by medical clinics owned and operated by non-physicians).

[2] The operative (S3) Indictment (Dkt. No. 282) is not a speaking indictment and does not allege the same degree of factual detail as the original indictment.  (See Dkt. Nos. 1, 191)  However,

Imaging, PC ("Nexray") – a Magnetic Resonance Imaging or "MRI" facility – which the Government alleges is actually owned and operated by Weiner's co-defendant Bradley Pierre, who is not a physician. (Id. ¶¶ 8(b), 17)

The Government further alleges that Weiner's participation in the no-fault insurance fraud scheme included falsifying clinical findings of injuries in MRI reports he prepared at Nexray:

> The Specialists are licensed physicians who conducted the specialized medical care prescribed by the No-Fault Clinics, such as MRIs and X-rays. The Specialists include, among others, WILLIAM WEINER, the defendant, who is a licensed doctor of osteopathy who incorporated the MRI facility Nexray Medical Imaging PC ("Nexray" or the "MRI Facility") as part of the scheme. WEINER falsified clinical findings of injury in MRI reports that were submitted to insurance companies.
>
> . . . .
>
> BRADLEY PIERRE and WILLIAM WEINER, the defendants, agreed to falsify clinical findings of injuries on MRI reports and pressure radiologists working for Nexray to exaggerate findings of injuries in their own reports. These false clinical findings, in turn, allowed referring physicians and attorneys to bill for additional benefits under the No-Fault Law and obtain larger legal settlements and judgments.

(Id. ¶¶ 8(b), 18)

The Government and Weiner have retained physicians to offer expert testimony as to whether Weiner in fact falsified reported injuries on MRI reports. The Government's expert is Dr. Scott S. Coyne, while the defense expert is Dr. Pukenas.

## II.   THE GOVERNMENT'S EXPERT DISCLOSURES

Dr. Coyne prepared two expert reports concerning 99 randomly-chosen MRI reports prepared by Dr. Weiner. (Govt. Br. (Dkt. No. 309), Exh. A, at 14; id., Exh. B, at 39) Dr.

---

the Government has represented that it intends to prove up at trial the factual allegations concerning Weiner set forth in the original indictment. (Dec. 12, 2023 Tr. (Dkt. No. 322) at 15)

2

Coyne concluded that nearly all of the 99 Weiner MRI reports had been falsified, including by describing injuries that did not exist, exaggerating injuries that did exist, and ignoring ailments that were degenerative in nature, and thus not the result of an automobile accident. (Id., Exh. A, at 14-16, Exh. B, at 39-42)[3]

Dr. Coyne's initial twenty-four page expert report was provided to the defense on April 13, 2022, and addressed 40 MRI reports prepared by Weiner (the "Initial Coyne Report"). (Id., Exh. A, at 13)  On November 15, 2022, the Government produced Dr. Coyne's 33-page supplemental report that addresses an additional 59 MRI reports prepared by Weiner (the "Supplemental Coyne Report").[4]  (Id., Exh. B, at 38)

The Government asked Dr. Coyne to review 100 "randomly selected" MRI reports prepared by Weiner. (Id., Exh. A, at 14, Exh. B, at 39)  For 99 of these MRI reports, Dr. Coyne conducted a "detailed initial assessment of all the images in each [MRI] study" and "formulat[ed] . . . diagnostic radiology opinions." (Id., Exh. A, at 14)  Coyne then "reviewed [Weiner's] respective radiology report . . . and recorded [his] specific agreement or disagreement with the opinions stated in the radiology report of the particular exam." (Id.)

In his expert reports, Coyne organizes the patients' MRIs into three categories: those showing (1) "Normal MRI Examination"; (2) "Mild Degeneration"; and (3) "Moderate to Advanced Degenerative Pathology." (Id., Exh. A at 14, Exh. B at 40)  For each category, Coyne provides a paragraph-length summary explaining why he agrees or disagrees with the

---

[3] The page numbers of documents referenced in this order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[4] Dr. Coyne was asked to review 60 MRI reports in connection with his supplemental report, but was not able to find a radiology report for one of the patients. (Id., Exh. B at 39)  His report therefore addresses 59 MRI reports rather than the requested 60. (Id.)

3

conclusions set forth in Weiner's MRI report for each patient. (Id., Exh. A at 15, Exh. B at 40-41)

Coyne also sets forth his conclusions as to each individual MRI report in lengthy appendices attached to his two reports. For each patient, Coyne records, inter alia, the patient's name[5] and age, a description of his observations and conclusions from the MRI images, and an explanation as to whether he agrees or disagrees with Weiner's diagnostic conclusions, as set forth in Weiner's MRI report. (Id., Exh. A at 17-37, Exh. B at 43-71)

In the Initial Coyne Report, Coyne states that "[i]n 39 of 40 cases my opinions were in substantial disagreement with the diagnostic findings contained in [Weiner's] radiology report." (Id., Exh. A, at 14) Coyne further states that his review of the 40 MRI reports "demonstrated an overwhelming number of false positive diagnoses, and a clear pattern of false radiologic reporting of clinically significant diagnoses and other findings not present on the MRI images." (Id. at 16) Coyne further opines that Weiner's "reports of these MRI examinations represent substantial departures from accepted standards of care in diagnostic radiology interpretation and communication." (Id.)

In the Supplemental Coyne Report, Coyne states that "[i]n 55 of 59 cases my opinions substantially disagreed with the radiologic findings and resultant diagnoses contained in [Weiner's] radiology reports" (Id., Exh. B, at 39) As in the earlier report, Coyne finds that the 59 MRI reports reviewed for purposes of the supplemental report "demonstrated an excessive number of false positive diagnoses in all patient categories." (Id. at 41) Coyne further concludes

---

[5] Patients' names are redacted in publicly filed material to include only first and last initials.

that the 59 MRI reports "represent substantial departures from accepted standards of care in diagnostic radiology interpretation and communication." (Id. at 42)

### III. WEINER'S EXPERT DISCLOSURE

On December 22, 2023 – less than a month before trial – Weiner produced a six-page expert report prepared by Dr. Pukenas. (Pukenas Report (Dkt. 317-1) at 2)

Dr. Pukenas is an Associate Professor of Radiology and Neurosurgery at the University of Pennsylvania. (Id.) Weiner engaged Dr. Pukenas to (1) "offer opinions on standards and practices in radiology"; (2) "examine independently each of the radiological examinations and reports that Dr. Weiner conducted of the persons identified in the Report and Supplemental Report of Dr. Scott S. Coyne, and to assess independently Dr. Coyne's evaluations of Dr. Weiner's reports (including his methodology)"; and (3) "offer [an] opinion as to whether Dr. Weiner's work in these cases was consistent with the standard of care for a radiologist." (Id.)

In connection with preparing his report, Dr. Pukenas reviewed the "original MRIs" and Weiner's "interpretive reports" for the patients that Dr. Coyne reviewed, as well as Coyne's two expert reports. (Id.) Dr. Pukenas also reviewed certain "clinical information" for the selected patients that was purportedly "available to Dr. Weiner at the time he conducted the initial reads for these patients." (Id.) Coyne did not review this "clinical information." (Id.)

Dr. Pukenas concludes that Weiner's MRI reports are "within the standard of care for radiologists," and he states that he "did not see evidence of a pattern of overreporting or exaggerating findings." (Id.) Pukenas notes that

> academic studies show that radiologists often disagree regarding particular findings when reading MRIs (and that radiologists often disagree with themselves when reading the same scan at different times). Here, although I disagreed with some of Dr. Weiner's findings, our level of disagreement was consistent with that which is reported in the literature and in line with my own experience as a practitioner. Further, to the extent that I disagreed with Dr. Weiner, it was because, in nearly equal numbers, Dr. Weiner: (i) made findings that I would not

5

> have reported; or (ii) failed to make findings that I would have reported (for example, Dr. Weiner consistently failed to report findings suggesting degeneration relating to the facet joint—a set of conditions that could cause pain, particularly if aggravated by trauma).  Similarly, I disagreed with Dr. Coyne's findings both because he made findings that I would not have reported and because he failed to make findings that I would have.  I should note that, in some instances, Drs. Weiner and Coyne both failed to identify findings that I would have made . . . .

(Id. at 1-2 n.2)

Unlike Dr. Coyne, Dr. Pukenas does not support his conclusions with a patient-by-patient analysis setting forth his findings concerning individual MRI reports prepared by Weiner.  In other words, Pukenas did not disclose on a patient-by-patient basis whether he agreed or disagreed with (1) the vast majority of Weiner's diagnostic opinions as set forth in the 99 MRI reports at issue; or (2) Dr. Coyne's criticisms of Weiner's analyses.  Instead, in his short report, Dr. Pukenas offers general commentary, including that radiologists often disagree with each other as to what an MRI reveals, and "often disagree with themselves when reading the same scan at different times."  (Id.)

As to Dr. Coyne's reports, Pukenas dismisses them as not reliable, because Coyne did not consider "the clinical information available to Dr. Weiner at the time he conducted the initial reads [of the patients' MRIs]."  (Id. at 1; see also id. at 3 (noting that Weiner "had access to clinical data when reviewing the scans"); id. (asserting that "Dr. Weiner's use of clinical data appears to have resulted in more appropriate diagnoses"); id. (noting that while "Dr. Weiner use[d] clinical data, Dr. Coyne stated in his report that he did not review or consider clinical information on the patients"); id. (asserting that "clinical information on a patient's condition is an important part of interpreting diagnostic images in radiology"); id. at 3-4 (criticizing Coyne's failure to "consider[] . . . patient [N.B.'s] clinical history); id. at 4 ("Without understanding the clinical history and circumstances, it would be difficult for a radiologist to evaluate whether an

6

imaging finding . . . is the etiology of a patient's pain."); id. at 5 (asserting that "Dr. Coyne's methodology is inappropriate" given his "fail[ure] to consider patient clinical information"))

## IV.     ORDER REQUIRING SUPPLEMENTAL EXPERT DISCLOSURE

On December 24, 2023, the Government moved for supplemental expert disclosures, arguing that Dr. Pukenas's six-page report did not meet the standard set in Federal Rule of Criminal Procedure 16(b)(1)(C)(iii), which requires a defendant to produce, inter alia, "a complete statement of all opinions that the defendant will elicit from the [expert] witness in the defendant's case-in-chief" and "the bases and reasons for them."  Fed. R. Crim. P. 16(b)(1)(C)(iii)  The Government contended that Weiner's expert disclosures did not meet this standard, and asked the Court to order Weiner to supplement his disclosures by adding an "MRI-by-MRI analysis" for each of the MRI reports Dr. Pukenas reviewed.  (Govt. Br. (Dkt. No. 309) at 3, 8)

In a January 5, 2024 Order (Dkt. No. 342), this Court granted the Government's application, finding that Dr. Pukenas had offered only "conclusions and generalities" in support of his opinions that (1) Dr. Weiner's MRI reports are "within the standard of care for radiologists"; (2) there is no "'pattern of overreporting or exaggerating findings'" in Weiner's MRI reports; (3) "'radiologists often disagree regarding particular findings when reading MRIs'"; (4) "'radiologists often disagree with themselves'"; and (5) clinical information is necessary in order to properly interpret an MRI image.  (Jan. 5, 2024 Order (Dkt. No. 342) at 7, 12 (quoting Pukenas Report (Dkt. No. 317-1) at 2 & n.2, 3)).

On January 12, 2024, Weiner produced supplemental disclosures from Dr. Pukenas, in which he conducts an MRI-by-MRI analysis of the randomly-selected Weiner MRI Reports, setting forth his conclusions as to each of the Weiner MRI reports that he reviewed.  (Govt. Jan. 12, 2024 Ltr. (Dkt. No. 368))

In a January 12, 2024 letter, the Government renews its motion to preclude Dr. Pukenas's testimony. (Id.) While acknowledging that Dr. Pukenas has produced the MRI-by-MRI analysis required by the Court's January 5, 2024 order, the Government contends that Dr. Pukenas's opinions do not meet the standard for admissibility under Fed. R. Evid. 702.

## DISCUSSION

### I. LEGAL STANDARDS

#### A. Federal Rule of Evidence 702

Whether expert testimony should be admitted is a matter committed to the trial judge's "broad discretion." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (citations and quotation marks omitted). Under Federal Rule of Evidence 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . :
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In Daubert v. Merrell Dow Pharm., Inc., the Supreme Court instructed that Rule 702 imposes a "gatekeeping" responsibility on trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. 579, 589 (1993). "Per Daubert and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert

8

intends to testify." Washington v. Kellwood Co., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) (citations omitted). The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements for admissibility have been met. United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

"[W]hether a purported expert is qualified under Rule 702 is an inquiry to be resolved prior to all others." Washington, 105 F. Supp. 3d at 304 (citation omitted). "Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give." S.E.C. v. Tourre, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citation omitted).

In assessing reliability, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). In determining whether the expert's opinion is reliable, a trial court should consider, inter alia, "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015) (quoting Daubert, 509 U.S. at 593–94). The inquiry is a "flexible one," however, and there is no "definitive checklist or test" for determining the reliability of expert testimony. Id. (internal quotation marks and citations omitted).

Moreover, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Amorgianos, 303 F.3d at 267. "The judge should only exclude the evidence if the flaw is large enough that

the expert lacks good grounds for his or her conclusions." Id. (internal quotation marks and citations omitted). "As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596). There must be "a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions," however. Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005). "[I]t is critical that an expert's analysis be reliable at every step." Amorgianos, 303 F.3d at 267. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Finally, a trial court must consider whether the expert's testimony will assist the jury. "This inquiry looks primarily to whether the testimony is relevant." 523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 644 (S.D.N.Y. 2014) (citation omitted). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

A district court has "the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether that expert's relevant testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). In that regard, district courts "often hold pretrial evidentiary hearings pursuant to [Federal] Rule [of Evidence] 104(a) to determine whether expert scientific (or other specialized) testimony is reliable under Daubert, regardless of whether the parties have requested such a hearing." Colon ex rel. Molina v. BIC

10

USA, Inc., 199 F. Supp. 2d 53, 70 (S.D.N.Y. 2001).  Whether to conduct such a hearing "rests within the discretion of [the district court]."  Id.

### B.  Analysis

There is no issue here concerning Dr. Pukenas's qualifications to testify about the accuracy of Dr. Weiner's MRI reports.  Dr. Pukenas is an Associate Professor of Radiology and Neurosurgery at the University of Pennsylvania, has been engaged in the clinical practice of radiology for many years, has an extensive list of publications and academic presentations regarding radiology, and has testified as an expert witness.  (Pukenas Rpt., Exh. A (Dkt. No. 317-1) at 9-27)  The Government contends that his proposed testimony should nonetheless be excluded, however, both because it is not reliable and because Dr. Pukenas has not explained how his opinions are "'consistent with that which is reported in the literature and in line with [his] own experience as a practitioner.'"  (Govt. Jan. 12, 2024 Ltr. (Dkt. No. 368) at 2 (quoting Pukenas Report (Dkt. No. 317-1) at 2 & n.2))

Based on its preliminary review of Dr. Pukenas's supplemental disclosure, the Government states that Dr. Pukenas "disagreed either completely or partially with Weiner's findings in approximately 66 of the 91 MRIs he reviewed – or 72%.  These disagreements include that Weiner reported herniations that were not present and failed to report degeneration that was [present]."  (Id.)

Given that the central finding of Dr. Pukenas's initial report is that Dr. Weiner's MRI reports are "within the standard of care for radiologists," and that there is no "pattern of overreporting or exaggerating findings" (Pukenas Rpt. (Dkt. No. 354-3) at 2), the Government's assertion that Dr. Pukenas disagreed with Dr. Weiner's findings 72% of the time is extremely troubling, and raises issues about the reliability of his opinion that Weiner's MRI reports fall

11

within the standard of care and do not present a pattern of intentional falsification. To the extent that Dr. Pukenas intends to testify that a disagreement or error rate of 72% is common or accepted in the practice of radiology, he has not yet cited academic literature that would support such an assertion.

## CONCLUSION

A <u>Daubert</u> hearing is necessary before this Court can make a determination as to whether Dr. Pukenas's opinions are sufficiently reliable to be introduced at trial. The <u>Daubert</u> hearing will take place on **January 17, 2024, at 1:00 p.m.** in the U.S. Courthouse, Courtroom 705, 40 Foley Square, New York, New York.

Dated: New York, New York
       January 14, 2024

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge