UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 22-cr-19 (PGG) |
| | ) | |
| WILLIAM WEINER | ) | |
| | ) | |
| Defendant. | ) | |

## DR. WILLIAM WEINER'S MEMORANDUM IN AID OF SENTENCING

In January 2024, Dr. William Weiner pled guilty to the one-count conspiracy alleged in the (S5) Information. He acknowledged having agreed with: (i) his then counsel to falsely minimize Bradley Pierre's role in his practice during two Examinations Under Oath (EUOs); and (ii) his then accountant to file tax returns knowing that they contained improper deductions for country club and automobile expenses. Dr. Weiner accepts and regrets that he made terrible judgments. Ex. 1 (W. Weiner). And he has paid, and will pay, dearly for his crimes.

At the same time, as more than 65 friends, colleagues, and family members attest, Dr. Weiner—or "Bill" or "Billy," as most of his friends know him—is a decent, caring man who has led an honorable and giving life. Soon to be 68 years old, he is a loving husband of 40 years, father, son-in-law, and grandfather. He is the glue that holds his extended family together. He is also a talented, hard-working radiologist, who has always freely shared his medical knowledge, by reading cases, helping people to find appropriate care, and explaining diagnoses or procedures.

As many of the letters note, Bill is also trusting to a fault. Here, Bill put his trust in the wrong people—people like Bradley Pierre, Russell Friedman, and Albert Haft—all of whom took advantage of him. That in no way excuses his own wrongdoing—which, as he knows, and fully accepts, is personal to him. But it helps explain, at least in part, how it is that Dr. Weiner finds himself before this Court.

On June 12, 2024, Dr. Weiner will be sentenced. He will leave this Court a felon, unemployed, uncertain as to whether he will be permitted to practice medicine again, with crushing debts and an irreparably tarnished reputation and legacy. Against this backdrop, the Court must fashion a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of the Sentencing Reform Act. 18 U.S.C. § 3553(a). Given the nature of Dr. Weiner's offense conduct, his personal history and circumstances, and the collateral consequences that he has and will suffer, we respectfully submit that the Court should adopt the Probation Department's recommendation (two-year term of probation, $430,000 forfeiture judgment, $15,000 fine, and $100 special assessment). *See* Presentence Report (PSR) at 31.

## BACKGROUND

### I. DR. WEINER'S HISTORY

Bill Weiner was born and raised on Long Island, New York, where he has lived his entire life. *Id.* ¶¶ 53-61. It's where he met his wife, raised his three daughters, and where he now dotes on his grandchildren. *Id.*

Bill comes from a long line of doctors. Both of his grandfathers were doctors. His father was a doctor. And two of Bill's daughters are doctors. Exs. 2 (L. Weiner), 3 (R. Weiner-Held), 4 (E. Jacobson), and 5 (A. Schreier). And although Bill idolized his father,

a radiologist who built a thriving practice on Long Island, he first sought out a career in independent film. By the time that Bill changed course and entered medical school, he was older than his fellow students, married, and raising a family. Ex. 2 (L. Weiner).

In medical school, Bill chose radiology as his specialty, and then completed a radiology residency in the South Bronx. PSR ¶ 72. He completed two different fellowships in radiology, becoming Board certified in 1996. *See id.* Over the next 20 years, Bill worked for hospitals and private radiology groups. *See id.* ¶¶ 77-82. On the side, Bill read cases for other radiologists and his medical school's clinic, where he taught medical students radiology. *See id.* He worked exceedingly hard, typically clocking 60 to 80 hours per week. Ex. 2 (L. Weiner).

Bill's professional dream was to own his own practice, just like his father. So, in 2011, he jumped at the chance to start a practice of his own. Dr. Weiner retained counsel to help him negotiate a lease, to purchase MRI equipment, and to secure financing for his practice—all from the owner of the building. At first, Bill thought he'd found an excellent opportunity but then Dr. Weiner was named as a defendant in a civil RICO suit against the building owner. Bill soon quit the lease, severed his relationship with the building owner, and directed counsel to resolve the civil RICO claims. He returned to full-time practice at a large radiology practice near his home.

But Dr. Weiner still wanted to run his own practice, and he'd met two people—Messrs. Pierre and Friedman—who claimed that they could help him. Today, Dr. Weiner knows that Mr. Pierre is a criminal. Back then, he believed that Mr. Pierre was a legitimate businessman who had established relationships with several medical practices and who was prepared to help finance his practice. Similarly, while Dr. Weiner realizes today that Mr.

Friedman's advice was tainted by conflicts, he believed Mr. Friedman when he assured Dr. Weiner that his practice complied with New York's rules governing the practice of medicine.

In 2014, Dr. Weiner opened Soul Radiology's Howard Beach office. Opening a radiology practice is expensive. To build out the medical office and to finance the purchase of an MRI machine, Dr. Weiner took out (and personally guaranteed) more than $1.2 million in loans. (Bill later personally guaranteed more than $1 million in additional loans to build an office in the Bronx.) He hired medical architects to help design the site. He hired billing staff and MRI technicians. And he hired Sotiris "Steve" Paleocostas to oversee the practice on a day-to-day basis. As Mr. Paleocostas explains in his letter, he knows, from his own experience, that Dr. Weiner owned and controlled Soul Radiology. Ex. 6 (S. Paleocostas). As he explains, he spoke with Dr. Weiner almost every day about reading MRIs and x-rays, dealing with referring physicians, staffing and the like. *See id.* In short, Dr. Weiner made all of the other decisions that a small business owner makes.

## II.   MR. PIERRE'S SYSTEMATIC FRAUD

Dr. Weiner was not an astute businessperson. Among other things, he was too trusting: he paid over funds to Mr. Pierre when Mr. Pierre told him they were due. He did not realize until too late that Mr. Pierre—with the assistance of Albert Haft, the CPA who serviced both of their accounts—was defrauding him.

The Declaration of Tom Bishop describes Mr. Pierre's scheme. Ex. 7 (T. Bishop). At bottom, Mr. Pierre directed Mr. Haft to make false entries in Dr. Weiner' business books that made it appear as though Dr. Weiner owed Mr. Pierre materially more money than he

actually did. *See id.* Mr. Bishop estimates that Mr. Pierre obtained as much as $3.0 million more from Dr. Weiner than he should have. *See id.*

Although Dr. Weiner never fully understood the money flow, he started to sense that something wasn't right by mid-2020. When he started to think that he was overpaying Mr. Pierre, he began asking for a "reconciliation"—something showing who had paid what to whom and correcting any overpayments. Ex. 6 (S. Paleocostas). Mr. Pierre kept saying that he would provide one, but he never did. Dr. Weiner approached Mr. Haft for help, but Mr. Haft gave him worthless reports filled with false numbers.

In February 2021, Dr. Weiner asked Mr. Friedman to help him remedy the payment situation. But just about a month later, in March 2021, Dr. Weiner received a grand jury subpoena. That was the first he learned of the Government's investigation. He was concerned, as anyone would be. Yet Dr. Weiner believed that Pierre had taken advantage of him. So, even while he was dealing with the criminal matter, he sued Mr. Pierre for fraud. He settled for less than he should have: he did not know that the accounting records from Mr. Haft were filled with false entries—entries that were made at Mr. Pierre's direction—until discovery in this case supplied crucial details regarding the Haft/Pierre scheme to defraud him.[1]

## III.   DR. WEINER'S GUILTY PLEA

The (S5) Information—to which Dr. Weiner pled guilty—alleges that Dr. Weiner falsely minimized Mr. Pierre's role in his practice during two EUOs and that he filed tax returns that he knew to have included improper deductions for automobile and country club

---

[1] Dr. Weiner used the settlement money to re-pay the banks and medical devices company that had lent him roughly $2.5 million to build his medical offices and to purchase MRI and x-ray machines.

expenses. As the Plea Agreement reflects, the parties agreed to the combined loss amount ($250,000 to $550,000); the offense level (14), the criminal history category (I), the Guidelines recommended sentence (15 to 21 months), the fine range ($7,500 to $75,000), and to entry of a forfeiture judgment in the amount of $430,000.

During his allocation, Dr. Weiner confirmed that he agreed with Mr. Friedman to "minimize Mr. Pierre's role" in his practice "to help facilitate payment" for medical services. Even though he believed that he was entitled to payment, he explained that he minimized Mr. Pierre's role because he knew that the insurance companies would seek to use Mr. Pierre's involvement to try to deny otherwise valid claims. Dr. Weiner also admitted that he "understood that [his] tax returns contained deductions for country club and automobile expenses that were improperly aggressive."[2]

## **ARGUMENT**

The Sentencing Reform Act instructs this Court to impose the least severe sentence available that effectively advances the purposes of sentencing. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) (discussing the "parsimony principle"). Put differently, the sentence must be "sufficient, but not greater than necessary," to vindicate the "four identified purposes of sentencing: just punishment, deterrence, protection of the

---

[2] Although they do not bear on the Guidelines calculations, Dr. Weiner objects to certain of the statements in the PSR as inaccurate. Specifically, the PSR asserts that Dr. Weiner agreed that Mr. Pierre would pay other clinics for referrals (e.g., PSR ¶ 16), that Dr. Weiner entered into a "phony" loan agreement with Mr. Pierre (*id.* ¶ 22); and that Dr. Weiner agreed to overstate "management fees" on his tax returns (*id.* ¶¶ 25(d)). The PSR also contains irrelevant but prejudicial statements. For example, in discussing Dr. Weiner's tax returns, the PSR implies that he violated the tax laws when installing a "luxury pool" at his home, *id.* ¶ 26, but Dr. Weiner never deducted those expenses on his business or personal tax returns. Ex. 7, n.1 (T. Bishop).

public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017); *see also* 18 U.S.C. §3553(a).

In determining a sentence that satisfies the parsimony principle, the Court "must … consider the pertinent Guidelines and policies adopted by the Sentencing Commission," *Dean*, 581 U.S. at 67, but it must not "presume that a Guidelines sentence is reasonable," *United States v. Caver*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Instead, the Court must determine an appropriate sentence based on "the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to serve the four overarching aims of sentencing." *Dean*, 581 U.S. at 67 (internal quotations omitted).

Here, after carefully considering these factors, the Probation Department recommended—and we concur—that a two-year term of probation, entry of the agreed order of forfeiture, and the imposition of a fine would be "sufficient, but not greater than necessary," to achieve the purposes of sentencing. 18 U.S.C. § 3553(a)(2). We respectfully request the Court to impose a non-custodial sentence in light of, among other things, Dr. Weiner's age, his personal history and circumstances, the offense conduct, and the severe financial penalties and professional consequences that have and will flow from his plea.

## I. THE NEED TO IMPOSE A JUST PUNISHMENT

The Sentencing Reform Act requires the Court to impose a just punishment. That, in turn, requires the Court to consider the defendant's history and circumstances, the offense conduct, the defendant's role in that conduct, and sentences imposed in similar cases. Here, Dr. Weiner committed financial crimes that, as a result of his plea, will result

in crippling financial penalties. But imprisoning a 68-year-old man with no criminal record and substantial, ongoing family responsibilities—at substantial expense to the government—is not necessary to achieve a just result.

### A.   Dr. Weiner's Background

Dr. Weiner has lived an honorable life. Apart from this offense, he has no criminal history—not even a speeding ticket. He has devoted most of his life to two things: his family and the practice of medicine.

Nearly every letter—if not every letter—attests to Bill's commitment to his family. They describe a humorous, kind, man who consistently put others first. His wife, and daughters share how difficult this case has been for all of them, and the shame that Bill feels for having been the cause of their distress. Exhibits 2 (L. Weiner), 3 (R. Weiner-Held), 4 (E. Jacobson), and 5 (A. Schreier). Other letters explain how important Bill is to the entire, extended family. *See, e.g.,* Exs. 8 (J. Jacobson), 9 (M. Jacobson), 10 (D. Schreier), 11 (N. Tice), 12 (S. Chernoff), 13 (R. Partman), 14 (L. Acriche), 15 (R. Weiss), 16 (M. Acriche). Collectively, the letters reflect that Bill has for decades been the hub of a large, close, and connected family.

Even in the wake of the indictment, Bill has continued to care for his family. He is actively involved in raising his three-year old grandson, with whom he enjoys an exceptionally close bond. *See, e.g.,* Exs. 3 (R. Weiner-Held), 9 (M. Jacobson). He is a primary caregiver for his widowed, 91-year-old mother-in-law. Ex. 17 (Miller). In fact, as her letter notes, Bill visits her twice a day—she lives around the corner—to help her with her medications and blood testing. *See id.* And Bill serves as a guardian to his

younger cousin, Michael, who suffers from significant disabilities. Ex. 18 (A. Kingon), 19 (J. Kingon).

Many letters also speak to Bill's commitment to the practice of medicine. Some of the letters come from other doctors or medical providers. Dr. Lawrence Daniel explains that Bill made life-saving radiology reads in cases that he handled for free. Ex. 20. Dr. Neil Soskel, who has known Bill since medical school, praises Bill for his compassion, his thoughtfulness, his willingness to help others, and his long history of exceptional patient care. Ex. 21. Dr. Alan Rothpearl, for whom Dr. Weiner once worked, similarly praises his character and integrity, both personal and professional. Ex. 22. Dr. Neil Lisann, who has known Bill since high school, lauds his decency and the accuracy of his reads. Ex. 23. Dr. Martin Topiel shares his view that Dr. Weiner has always held patient care as his highest concern. Ex. 24. Dr. Lisa Berger echoes all of these sentiments, stressing that not only was Bill an excellent radiologist, but that he demonstrated his caring nature when interacting with patients. Ex. 25. And Chana Mirsky describes Bill's work reading ultrasounds for underprivileged women, noting that his reports were "timely, accurate and exceedingly detailed." Ex. 26.

Other letters come from patients or the family of patients who benefitted from Bill's radiology skills. David Nikravesh explains that Dr. Weiner saved his life—not once, but twice—by detecting swelling in his brain on MRI scans that had been overlooked at the hospital. Ex. 27. Alex and Sharon Rusinowitz note that Bill helped to save Alex's father's life when he detected an early form of Leukemia in a chest scan. Ex. 28. And Ann Acriche documents multiple occasions where Dr. Weiner helped to diagnose and treat her family members—including her elderly mother, her brother and sister, and her daughter. Ex. 29.

Notably, Bill did not charge anything in connection with any of these cases; he read these scans, shared his knowledge, and helped to save and better lives, simply because he could.

Finally, still other letters are from people who Bill didn't treat personally, but who counted on Bill to help them navigate medical conditions. Benjamin Schreier, a service member in the US Army, explains that, when he suffered from severe back pain, Bill not only recommended his own spinal doctor, but he also took the time to explain medical procedures and results in a clear, reassuring, and knowledgeable way. Ex. 30 (B. Schreier). Steven Alderman says much the same thing: when he had cervical spine surgery, Dr. Weiner "explain[ed] the surgery and my anticipated recovery with greater precision and detail than those treating me." Ex. 31. So too does Eva Weingarten. Ex. 32. Morey Berger writes that, after he suffered a head injury during the peak of COVID, when hospitals were overwhelmed, Dr. Weiner spent endless hours monitoring his condition and getting him the help and tests he needed. Ex. 33. And Robert O'Hare highlights Dr. Weiner's empathy and advice. Ex. 34. Again, these were not paying clients. Bill took the time and energy to help them navigate the medical world because he takes seriously his obligations as a physician to help those who need help.

In short, the letters submitted herewith paint the picture of a kind, caring, and generous man, who is deeply committed to his family and his community, and who has demonstrated honesty and integrity over the course of multiple decades. And while Dr. Weiner certainly appreciates the support he has received from friends and family, he is ashamed to have needed to ask for their help. He knows that what he did here falls far short of the standards that he has set over the years.

### B.     The Nature and Circumstances of the Offense

Dr. Weiner deeply regrets ever going into business with Mr. Pierre. He understands today that Mr. Pierre orchestrated multiple criminal schemes, including bribery schemes, tax schemes, and fraud schemes. But Mr. Pierre kept this conduct from him.

Dr. Weiner believed that he was engaged in the legitimate practice of medicine. The patients he served were *bona fide* accident victims. These patients were scanned in a professional manner at a state-of-the-art radiology office. The MRIs were read by Board-certified radiologists. And Dr. Weiner insisted that the reports should describe all findings in a detailed way, thus allowing treating physicians to understand the injuries suffered. Dr. Weiner believed (and still believes) that he provided these medical services in a manner that was consistent with best medical practices and with New York law. In line with Judge Oetken's observations when imposing a substantially below-Guidelines sentence in a similar case, the "inherent fuzziness" of the New York rules and the fact that Dr. Weiner provided real services are mitigating factors. *United States v. Gabinskaya*, 12-CR-171 (JPO), Transcript of Sentencing Hearing [DE#1603] 28 (April 6, 2015).[3]

---

[3] In that case, where an absentee physician was convicted at trial of healthcare fraud, the Sentencing Guidelines called for a sentence of imprisonment of 57 to 71 months (offense level 25). In explaining his decision to impose a substantially below-Guidelines sentence (a year and a day) as to Dr. Gabinskaya, Judge Oetken stated: "I'm going to say something about the loss amount. While the loss amount under the guidelines is quite high here, I believe that the loss amount under the guidelines does overstate culpability as compared to more common fraud cases; that is, it's not dollar for dollar. It is a dollar-for-dollar fraud legally, but it is not a dollar-for-dollar harm…. [B]ecause the PCs were involved in real treatment for real accident victims, … there is a sense in which as a practical matter the injury of the insurance companies is not practically intuitively represented by 100 [*sic*] on the dollar. And for that reason, and because of the ambiguous nature of what ownership is under the law, the kind of inherent fuzziness of that, I think that Dr. Gabinskaya… did not grasp the gravity of what [she] was involved in…. I think that's a mitigating factor." *Id.*

Still, Dr. Weiner is culpable for his own wrongdoing. Although he believed that he was entitled to payment for services, he made knowing misstatements in two EUOs that were intended to make it less likely that those companies would deny the claims. Had Dr. Weiner not made these false statements, the insurers may have refused to pay the claims, triggering arbitrations and litigations.

Dr. Weiner also filed tax returns that he knew contained inflated deductions for country club and automobile expenses. Those returns also included improper deductions related to overstated management fees. Ex. 7 (T. Bishop). Those deductions arose because Mr. Pierre directed Mr. Haft to inflate the management fees. *See id.* The purpose of these entries was to make it appear as though Dr. Weiner owed more money to Mr. Pierre than he actually did. *See id.* ¶¶ 3 & 4. Dr. Weiner did not know that these entries were fictitious. *See id.* And they were buried in a sea of seemingly arbitrary entries in his books and records. *See id.*

In his Plea Agreement, Dr. Weiner agreed to file amended tax returns for 2016-2020. He retained Mr. Bishop—who once served as a senior leader in the IRS Criminal Division—to prepare them. But the books and records that Mr. Haft maintained were in such poor shape that neither the Government nor Mr. Bishop was able to determine with any confidence whether there was a tax loss or how big it might be, in part because Mr. Haft improperly overstated Dr. Weiner's income. *See id.* & PSR ¶ 26. Accordingly, when amending his tax returns, Dr. Weiner took a conservative approach, reversing each and every deduction that the Government has cited as improper (and then some). *See id.* Dr.

Weiner is now filing those returns and tendering payment for the back taxes in the amount of roughly $112,000.[4]  *See id.*

## II.  IMPRISONMENT IS NOT NEEDED TO ACHIEVE DETERRENCE

Deterrence—specific and general alike—is an important aim of the criminal justice system.  But here, the direct and collateral consequences of Dr. Weiner's plea are so severe that they are more than adequate to send an effective message of deterrence to Dr. Weiner and others without the need for a sentence of imprisonment.

At sentencing, Dr. Weiner will be 68 years old.  Government statistics show that offenders like him—that is, older offenders with no criminal history—are exceedingly unlikely to recidivate.[5]  In fact, courts have recognized that the reduction in recidivism rates as people age is a factor that is not adequately accounted for by the Sentencing Guidelines.  *See, e.g., Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) (recognizing that recidivism decreases with age and is not accounted for in the Sentencing Guidelines).  Thus, Bills' age and his clean record suggest that a term of imprisonment is unnecessary to deter him from committing future crimes.

Dr. Weiner also faces crippling sanctions as a result of his plea.  As explained above, as part of the plea, Dr. Weiner agreed to entry of a $430,000 forfeiture order, and he must also pay $112,000 (plus interest and penalties) in back taxes.  Dr. Weiner also

---

[4] Mr. Bishop estimates that the tax loss attributable to the improper deductions for country club and automobile expenses that form the basis for the plea amounts to roughly $66,000.  Ex. 7, n.2 (T. Bishop).

[5] *See* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, 3 (2017) (finding that "[a]ge and criminal history exert[] a strong influence on recidivism" and noting that offenders in Criminal History Category I who were older than 60 at release are more than for times less likely to be re-arrested than younger offenders in the same criminal history category).

faces potential restitution obligations, although he is in advanced discussions to resolve all disputes with Liberty Mutual. Dr. Weiner also faces filed and potential litigation from other insurance companies. On top of that, he incurred more than $2 million in legal fees in this case alone. In short, the financial consequences of Dr. Weiner's conduct have been enormous.

Dr. Weiner has been ruined professionally. Although he was able to work as a radiologist while under indictment, his employer recently terminated his services. More fundamentally, Dr. Weiner's felony conviction will trigger suspension proceedings against his license. Dr. Weiner is unlikely to ever again be in a situation to commit any kind of crime associated with the practice of medicine. This is much more than an economic issue: Dr. Weiner's self-worth and identity is inextricably intertwined with his status as a physician. His conduct has irrevocably sullied that identity. Ex. 35 (N. Kimmelman).

In short, the experience of being indicted, nearly tried, convicted, and sentenced for a felony has been a ruinous experience for Dr. Weiner personally, professionally, financially, and in almost any way imaginable. The consequences he has faced already are more than enough to deter Dr. Weiner from committing *any* offense, let alone the serious offenses for which he was convicted—a sentence of imprisonment is not necessary to achieve specific deterrence. As his daughter notes, this Court will not see Dr. Weiner again. Ex. 4 (E. Jacobson.).

Imprisonment is likewise not necessary to achieve general deterrence. Dr. Weiner is well-connected and well-respected in the medical and business communities in Long Island. Dr. Weiner's indictment, the hardship and cost it has entailed, and his resulting guilty plea are known in these communities. The consequences that have befallen Dr.

Weiner are so severe that no thinking person would risk a similar fate. A sentence of imprisonment is not necessary to deter others who are or may be involved in the no-fault industry.

### III.  IMPRISONMENT IS NOT NEEDED TO PROTECT THE PUBLIC

For all of the reasons outlined above, Dr. Weiner is not a threat to the public. Over the course of his life, Dr. Weiner has helped an extraordinary number of people, without ever before committing a crime. He has a perfect compliance record over the course of two-years of supervised release. *See* PSR at 33. In short, there is no credible basis to suggest that even a day in prison is somehow necessary to protect the public.

### IV.  IMPRISONMENT IS NOT NEEDED TO PROMOTE REHABILITATION

Sentencing Dr. Weiner to prison would also do nothing to promote rehabilitation. Dr. Weiner does not need access to treatment programs, vocational training, or any of the other programs associated with the federal prison system. *See id.* Thus, a sentence of imprisonment would not be justified by any concerns around rehabilitation.

## CONCLUSION

For the foregoing reasons, the Court should adopt the Probation Department's recommended sentence (two-year term of probation, $430,000 forfeiture judgment, $15,000 fine, and $100 special assessment).

DATED this 28th day of May 2024.

Respectfully submitted,

 */s/ Kelly B. Kramer*_____
Kelly B. Kramer
William D. Sinnott
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC  20006
(202) 263-3007

*Counsel for Dr. William Weiner*
