

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

June 4, 2024

**BY ECF**

Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> Re:    ***United States v. William Weiner*,**
>        **S5 22 Cr. 19 (PGG)**

Dear Judge Gardephe:

The Government respectfully submits this letter in connection with sentencing in the above-referenced action, scheduled for June 12, 2024. Weiner participated in a wide-ranging scheme to defraud no-fault insurance providers. Weiner effectively sold his medical license to Bradley Pierre, his co-conspirator, to conceal that Pierre in fact owned and controlled the radiology practice to which Weiner lent his name; lied under oath about his relationship with Pierre; gave in to Pierre's demands for what radiologists could perform reads of MRI scans and how those reads should be done; and falsified his income tax returns to the point where, as Weiner's own expert concedes, it is almost impossible to determine what the true state of Weiner's and Nexray Medical Imaging's financial affairs was. For the reasons described more fully below, a sentence within the stipulated Guidelines sentencing range of 15 to 21 months' imprisonment would be sufficient and not greater than necessary to comply with the purposes of sentencing.

## Background

### A.  The Indictment and Guilty Plea

On or about June 23, 2023, a superseding indictment, S2 22 Cr. 19 (PGG), was filed charging Bradley Pierre, Marvin Moy, William Weiner, Arthur Bogoraz, and Jean Pierre. Weiner was charged with conspiracy to commit health care fraud, 18 U.S.C. § 1349; conspiracy to commit money laundering, 18 U.S.C. § 1956; and conspiracy to defraud the United States by filing false income tax returns, 18 U.S.C. § 371.

On or about January 16, 2024, six days before the scheduled commencement of trial,[1] Weiner pleaded guilty to a superseding information, S5 22 Cr. 19 (PGG) (the "Information") pursuant to a plea agreement. D.E. 385 (Transcript of January 16, 2024 Plea Hearing") ("Plea Tr."). The Information charged Weiner with one count of conspiring to commit health care fraud and tax fraud, 18 U.S.C. § 371. Pursuant to the plea agreement, Section 2B1.1 of the United States Sentencing Guidelines ("USSG" or "Guidelines") applies, with a base offense level of 6, § 2B1.1(a)(2); an upward adjustment of 12 levels based on a combined loss of more than $250,000 and not more than $500,000, § 2B1.1(b)(1)(G); a downward adjustment of 2 levels pursuant to Section 3E1.1(b) based on the defendant's acceptance of responsibility by entering a guilty plea; and a further downward adjustment of 2 levels as a zero-point offender pursuant to § 4C1.1. Because the defendant did not timely notify authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, he is not eligible for a further 1 level reduction pursuant to § 3E1.1(b).

Based on a total offense level of 14 and a Criminal History Category of I, the stipulated Guidelines sentencing range is 15 to 21 months' imprisonment, with a stipulated fine range of $7,500 to $75,000. The Presentence Investigation Report ("PSR") prepared by the United States Probation Office ("Probation") calculates the same offense level and sentencing range. *See* PSR ¶¶ 38-50, 90-98.

### B.  The Offense Conduct

#### 1.  Overview of New York's No-Fault Rules

New York State Law requires every vehicle registered in New York State to have no-fault automobile insurance, which enables the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault (the "No-Fault Law"). Under the No-Fault Law, patients injured in an automobile accident can assign their right to reimbursement from an insurance company to others, including, but not limited to, medical clinics that provide medical services to treat their injuries. If such an assignment is made, the medical clinics, or their agents, bill the insurance company directly for services rendered and receive payments directly from the insurance company. Typically, insurance companies compensate the medical practitioners at a fixed rate for various medical services performed on these accident victims.

Pursuant to New York State law, all medical clinics in New York State must be incorporated, owned, operated, and/or controlled by a licensed medical practitioner in order to be eligible for reimbursement under the No-Fault Law. Insurance companies will deny all billings for medical treatments from a medical clinic that was not actually owned, operated and controlled by a licensed medical practitioner.

---

[1] Trial was scheduled to commence on January 16, 2024.  *See* D.E. 222 (Transcript of August 23, 2023 proceedings).  On January 12, 2024, the trial date was adjourned by six days to January 22, 2024.

Insurance companies' principal method of enforcing this requirement is a procedure called an "Examination under Oath" or "EUO." Under the No-Fault Law, insurance carriers have the right to request that medical providers attend EUOs when insurers suspect that providers have submitted fraudulent claims. During the process, the physician is placed under oath and asked questions relevant to the claim at hand, including whether the medical practice is under the control of non-physicians. The physician is typically represented by counsel and has several months' notice prior to the proceeding.

### 2.  Overview of Bradley Pierre

From at least in or about 2008 up to and including in or about 2021, Bradley Pierre unlawfully owned and ran clinics located in the New York area including, among others, Veda Medical, Sky Medical, Sun Medical, and Rutland Medical (the "Clinics"). Pierre knew that clinics are unable to bill insurance companies for No-Fault benefits if the medical facilities are controlled by non-physicians. Pierre accordingly personally coached medical practitioners to lie under oath.

Pierre used his control of the Clinics for personal profit. Pierre transferred millions of dollars from the Clinics to pay his personal finances. He also used his control of the Clinics to steer victims patients to seek legal representation from his wife's law firm (the "Law Firm").

Pierre also used money from the clinics to pay bribes to fill the Clinics with patients. From at least in or about 2015 up to and including 2021, Pierre agreed with others to pay bribes to hospital employees, 911 dispatchers, and other individuals (collectively, "lead sources") for the confidential names and numbers of motor vehicle accident victims. Pierre agreed that others, including Anthony Rose, a/k/a "Todd Chambers," would then call victims and lie to them to induce victims to receive medical treatment at the Clinics and legal representation from the Law Firm.

As set forth below, Pierre played a substantial managerial role in Weiner's medical practice, Nexray Medical Imaging, d/b/a Soul Radiology ("Nexray") and received an huge share of the profits. Pierre and Weiner further agreed that Pierre would steer patients to seek MRIs at Nexray by using the Clinics under Pierre's control, as well as paying other clinics and "runners" for referrals. Pierre and Weiner agreed that Weiner would lie under oath about Pierre's involvement in Nexray because they knew insurers would not pay Nexray's claims if Weiner told the truth.

### 3.  Weiner's Repeated Perjury during Examinations under Oath

William Weiner incorporated Nexray in or about 2011. Nexray provided diagnostic radiology services (such as MRI, CT, and X-ray imaging) to patients. Nexray almost exclusively catered to patients with no-fault automobile insurance and therefore fell under the rules and regulations of the No-Fault Law.

In 2012, Liberty Mutual filed a civil racketeering complaint against Weiner and 13 others alleging, among other things, that Nexray was under the unlawful control of a non-physician named Yan Moshe, who was paying kickbacks and bribes to fill the facility with patients. *See Liberty Mutual v. Weiner et al.*, 12 Civ. 5666 (NGG) (VMS) (E.D.N.Y. 2012), Dkt. 1 (the "Liberty Mutual Complaint"). The Liberty Mutual Complaint detailed, among other things, false and

misleading testimony Weiner gave about Yan Moshe during an EUO conducted by Liberty Mutual the prior year (the "November 2011 EUO"). *See id.* ¶¶ 50-63.

The following year, in 2013, Mid-Century Insurance Company filed a civil fraud complaint against Weiner and others in New York Supreme Court with the same allegations—namely, that Nexray was under the unlawful control of a non-physician named Yan Moshe, who was paying kickbacks and bribes to fill the facility with patients (the "Mid-Century Complaint"). *See 21st Century Insurance Company v. Weiner et al.*, 159423/2013 (N.Y. Sup. Ct. N.Y. Co.) (the "Mid-Century Complaint"). The complaint detailed, among other things, false and misleading testimony about Yan Moshe provided by Weiner during an EUO conducted by Mid-Century earlier the same year. *See id.* ¶ 61.

Nexray temporarily closed in 2012 and Weiner ultimately settled both lawsuits in or about 2015. However, also in or about 2015, Bradley Pierre, another non-physician, replaced Yan Moshe's role in the practice. Pierre arranged for Nexray to reopen in 2016 and continue billing insurance companies under the No-Fault Law.

Mid-Century and Liberty Mutual requested that Weiner participate in EUOs in 2017 and 2021, respectively, so that the insurers could determine whether his practice was under the control of a non-physician—this time, Pierre. Weiner was represented by counsel and placed under oath at the beginning of the proceedings. Weiner was also given the opportunity to consult with counsel. Weiner nonetheless repeatedly perjured himself about Pierre's role in Nexray. Among other things, Weiner perjuriously claimed:

- Pierre did not do any marketing for Nexray or take any efforts to refer patients to Weiner;

- Pierre did not assist Weiner in re-opening Nexray in 2016;

- Pierre was simply a "funder" for Nexray;

- Pierre and Weiner had a non-recourse loan agreement, whereby Pierre loaned Weiner money and Weiner agreed to repay Pierre only if insurance companies paid Nexray's claims; and

- Pierre had no role in introducing Weiner to Nexray's accountant (who participated in both the healthcare fraud and tax conspiracies).

As set forth below, these were all lies. During Weiner's plea allocution, Weiner admitted he "falsely minimized Bradley Pierre's role in my medical practice to facilitate the payment of claims" by Liberty Mutual and Mid-Century. (Plea Tr. at 19). Weiner further stated that he knew, and his attorney knew, that he was ineligible for reimbursement because of Pierre's role in his practice. (*Id.* at 20 ("THE COURT: So are you saying that the attorney was aware that as a result of Bradley Pierre's role in your medical practice, that it was not lawful to obtain medical reimbursement from the insurance company? THE DEFENDANT: That's fair to say, your Honor.").

### 4.  Bradley Pierre's Role in Nexray

Weiner and Pierre agreed that Pierre would help re-open Nexray and steer patients to Nexray for MRI scans. Weiner knew that Pierre was paying medical facilities and "runners" for patients. Pierre further played a substantial managerial role in Nexray and advised on all aspects of the practice, including which radiologists Nexray should employ.

Weiner and Pierre hid Pierre's involvement in Nexray using a phony loan arrangement. The agreement purported that Pierre was making non-recourse loans to Nexray, which would only be paid back if insurance companies paid Nexray's claims. The agreements also set Pierre's "fee" as twice the amount loaned to the practice. However, in reality, Pierre took millions of dollars from Nexray in excess of what the purported loan agreement permitted. Pierre used this money to, among other things, pay hundreds of thousands of dollars in bribes.

Weiner and Pierre openly acknowledged Pierre's managerial role in Nexray to third parties—except to insurance companies. Weiner referred to Pierre as his "practice manager" in emails. (*See* Exhibit A). Every year from 2016 to 2020, Weiner recorded payments to Bradley Pierre's company on Nexray's tax returns as "management fees" rather than loans. An example from Weiner's 2018 tax return is below.

| Description | Foreign Amount (should only be used when attached to 5471 Schedule C Line 16) | Amount |
|---|---|---|
| Professional Fees | | 138,861 |
| Transportation Expense | | 81,785 |
| Insurance Expense | | 77,794 |
| Management fees | | 2,282,470 |

Weiner and Pierre also described payments to Pierre as "management fees" in applications for loans on behalf of Nexray from banks. For instance, in 2019, Pierre sent an email to Bank of America describing his role in Nexray as follows:

> There are multiple benefits why doctors use companies like mine. First, through our company, we provide the doctor access to our referring physicians. These are other doctors that are part of the same network. They refer the patients to the radiology practice . . . . We deal with all the external marketing as well. What I mean by that is we also market to refers outside of our network. Lastly, we are the business guys behind the doctors practice. The success of the practice is our number one objective in order for the management company to get paid on our fees.

(*See* Exhibit B). Similarly, in 2019 and 2020, Weiner told multiple banks that the payments to Pierre were "fees paid to management to help run the practice" and included "the marketing costs necessary to maintain patient flow." (*See* Exhibits C and D).

Pierre's "marketing costs" included paying "runners" to fill Nexray with patients. For example, in 2015, Weiner attempted to lease the MRI machine at a nearby medical facility to conduct MRIs on patients. The facility refused to enter an agreement because the facility was "concerned at [Weiner's] questionable practices" because they were "characteristic operations of . . . 'runners.'" (*See* Exhibit E). Weiner and Pierre also spoke openly about Pierre's relentless efforts to fill Nexray with patients. The below chart sets forth some of their text communications.

| Date | Messages |
|------|----------|
| 1/15/2017 | PIERRE: How's it going. This week, you'll see an increase in appointments. |
| 1/20/2017 | WEINER: We will finish up with total of 81 scans for the week. today alone we did 28 so it's climbing again<br><br>PIERRE: Did you doubt me?? |
| 2/3/2018 | PIERRE: Ok—FYI I got back 4 of the 6 accounts we lost. |
| 2/15/2018 | PIERRE: We lost 3 VERY good accounts. I'm scheduling for you to go see the doctor when your back. I'll take you myself. Numbers will be low for February.. |
| 2/27/2018 | PIERRE: I fixed the issue with 3 accounts. I'll call later to discuss. |
| 3/25/2018 | WEINER: We did 25 scans Friday Great number since close at 5 on Fridays<br><br>PIERRE: I'm pushing!!! I've been beating the pavement myself! |
| 4/13/2018 | PIERRE: Yes—I will write a stellar bio for you this weekend. During the week, I spend my time literally "begging" for work and crunching numbers. My creative juices are not running during those times. |
| 5/23/2018 | PIERRE: We need to arrange a meeting with this guy Saloman. I picked up 3 new busy accounts. I got a spine surgeon that's going to send you cases directly that will be paid by the PI attorney. |
| 5/23/2020 | PIERRE: Ok—has the volume of scans picked up? Lost 10 accounts, but I think we added 12 |
| 8/19/2020 | PIERRE: I need you to extend hours and give our refers priority with the appointments. We're losing accounts because of the scheduling.<br><br>As we all know, new players are trying to hit the market. We can't afford to loose [sic] are [sic] accounts.<br><br>WEINER: Full boat as before? Let's talk tomorrow.<br><br>PIERRE: Yes—even fuller. |

Likewise, Weiner knew that one of Pierre's runners—Jelani Wray, a/k/a "Lani," a/k/a "JR"—was arrested in November 2019 for bribery. Just a few days after Wray's arrest, Weiner sent an employee of Nexray a copy of the Government's press release and stated the following:

> Weiner:   JR was arrested. I'm on break w Friedman. Try to look up says was in paper and law journal too
> https://www.justice.gov/usao-sdny/pr/us-attorney-announces-arrest-27-individuals-includingnypd-employees-massive-bribery
> J R is Jelani Wray

> Employee: That's correct, was gonnaread [sic] article at work last week but got sidetracked, will do

> Weiner:   Interesting

> Employee: I should probably get his contact info erased from my phone

Weiner nonetheless continued to work with Pierre through January 2022—the date of Weiner's arrest.

Weiner committed perjury about all these topics during EUOs. As Weiner stated during his plea allocution, he lied because he knew that Liberty Mutual and Mid-Century would not pay insurance claims if he told the truth about Pierre.

With regard to the loss amount, at the time of the plea agreement, defense counsel gave the Government a good-faith estimate that Liberty Mutual and Mid-Century Insurance unlawfully paid Nexray approximately $430,000. The Government, accordingly, used this figure for the Guidelines calculation. However, based on our subsequent discussions with the two insurers, it appears that counsel's good-faith estimate was an underestimate. Weiner actually billed Liberty Mutual approximately $1,225,559.91, of which Liberty Mutual paid approximately $560,976.26. Weiner likewise billed Mid-Century Insurance approximately $392,806, of which Mid-Century Insurance paid approximately $338,604.55. Accordingly, while the Government will stand by the Guidelines figure in the plea agreement, the restitution amount is $899,580.91.

### 5.  The Tax Fraud

Pierre introduced Weiner to Nexray's accountant, Albert Haft, in furtherance of the scheme in or about 2014. Haft agreed to file materially false business tax returns for Nexray and individual tax returns for Weiner and his wife. As part of the scheme, Weiner falsely reported over $400,000 in personal expenses as "business expenses" on Nexray's tax return, thereby decreasing Nexray (and Weiner's) reported taxable income. These expenses included the following:

- Luxury, Family Country Club Fees: Weiner used Nexray to pay for his family's personal, luxury country club membership at Inwood Country Club. Weiner hid the expenses on Nexray's tax return by classifying approximately $132,000 in country club expenses as "advertising and promotion" and "job site." The label, "job site," was supposed to encompass costs for construction on a new MRI facility in the Bronx.

- <u>Luxury Car Rental</u>: Weiner used Nexray to pay for personal, luxury car leases from BMW and Mercedes Benz. Weiner hid the expenses on Nexray's tax return by classifying approximately $38,000 in luxury car leases as "equipment rental" and "machinery rental." The label, "machinery rental," was supposed to encompass costs for renting medical equipment.

- <u>American Express, Chase Credit, and Citibank Cards</u>: Weiner used Nexray to pay for his family's personal credit card bills. Weiner hid the expenses by classifying approximately $300,000 in personal expenses as "medical records and supplies" on Nexray's tax returns. These personal expenses included, among other things, season tickets to the Mets, luxury vacations and cruises around the world, clothing from Bloomingdales, and fine wine.

- <u>Management Fees</u>: Weiner and Pierre agreed that Nexray would classify huge sums of money that Nexray paid to Pierre as "management fees." Nexray deducted these payments to Pierre as business expenses, reducing Nexray's (and Weiner's) taxable income. Weiner and Pierre thus improperly reduced Nexray's reported taxable income by approximately $377,000.

Weiner's own amended tax returns further support the Government's calculation of every one of these false expenses. The amended tax returns include the following:

- <u>Amended 2016 Tax Returns</u>: Weiner admitted to overstating "Equipment Rental" by $7,049 and the "Cost of Goods Sold" by $13,103. (*See* Exhibit F).

- <u>Amended 2017 Tax Returns</u>: Weiner admitted to overstating "Machinery Rental" by $13,076, "Advertising" by $23,643, "Management Fees" by $127,873, and "Medical Records and Supplies" by $71,747. (*See* Exhibit G).

- <u>Amended 2018 Tax Returns</u>: Weiner admitted to overstating "Machinery Rental" by $13,560, "Management Fees" by $249,675, "Advertising" by $34,704, and "Medical Records and Supplies" by $71,747. (*See* Exhibit H).

- <u>Amended 2019 Tax Returns</u>: Weiner admitted to overstating "Job Site" by $36,283, "Equipment Rental" by $11,666, and "Medical Supplies" by $71,747. (*See* Exhibit I).

- <u>Amended 2020 Tax Returns</u>: Weiner admitted to overstating "Advertising and Promotion" by $65,515 and "Machinery Rental" by $10,788. (*See* Exhibit J).

Thus, in total, Weiner falsely overstated business expenses by approximately *$820,000*.

Weiner also used Nexray to pay other personal expenses, which he failed to declare as income. For example, in 2017 Weiner used Nexray to pay approximately $152,000 in personal expenses, including over $100,000 to renovate the backyard of his home. Weiner and Haft recorded these expenses in Nexray's accounting records as phony "shareholder distributions." Weiner's original and revised tax returns, however, state that Weiner never took any shareholder distributions. They were phony, and Weiner never reported these funds as personal income.

Original 2017 Tax Returns

| Schedule M-2 | Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed (see instructions) | | **(a)** Accumulated adjustments account | **(b)** Other adjustments account | **(c)** Shareholders' undistributed taxable income previously taxed |
|---|---|---|---|---|---|
| 1 | Balance at beginning of tax year . . . . . . . . . . . | | -98,530 | | |
| 2 | Ordinary income from page 1, line 21 . . . . . . . . . | | 46,991 | | |
| 3 | Other additions . . . . . . . . . . . . . . . . | | | | |
| 4 | Loss from page 1, line 21 . . . . . . . . . . . . . | | ( ) | | |
| 5 | Other reductions . . . . . . . . . . . . . . . . | | ( ) | ( ) | |
| 6 | Combine lines 1 through 5 . . . . . . . . . . . . . | | -51,539 | | |
| 7 | Distributions other than dividend distributions. . . . . . | | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 . . . | | -51,539 | | |

Amended 2017 Tax Returns

| Schedule M-2 | Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed (see instructions) | | **(a)** Accumulated adjustments account | **(b)** Other adjustments account | **(c)** Shareholders' undistributed taxable income previously taxed |
|---|---|---|---|---|---|
| 1 | Balance at beginning of tax year. . . . . . . . . . . . . . . | | -78,468. | | |
| 2 | Ordinary income from page 1, line 21 . . . . . . . . . . . | | 222,119. | | |
| 3 | Other additions. . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Loss from page 1, line 21 . . . . . . . . . . . . . . . . . | | | | |
| 5 | Other reductions. . . . . . . . . . . . . . . . . . . . . | | | | |
| 6 | Combine lines 1 through 5. . . . . . . . . . . . . . . . . | | 143,651. | | |
| 7 | Distributions other than dividend distributions. . . . . . . . . | | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 . . . . . . | | 143,651. | | |

In addition to these fraudulently reported business expenses, Weiner agreed to grossly misrepresent Nexray's financial transactions with Pierre. Pierre and Weiner relied on a fraudulent "financing agreement" designed to disguise Pierre's ownership of Nexray as a lender relationship, but also agreed that Nexray's payments to Pierre frequently would not be recorded as loan repayments.[2] Nor were the transactions recorded as a return on invested funds and a distribution of profits. Instead, Pierre and Weiner agreed that huge amounts of Nexray's payments to Pierre would be categorized as "management fees"—a fraudulent business expense that served to reduce Nexray's taxable income. The amount of Nexray's payments to Pierre's companies that were classified as management fees each year was determined solely by Pierre, as Weiner was well aware.

In total, Weiner either falsely reported as business expenses or failed to report at all nearly *over a million dollars in income*. This figure would have resulted in a staggering tax loss for the IRS. However, separate and apart from the tax fraud conspiracy, Weiner's wife mistakenly told Haft that certain payments to Nexray were income, which led Haft to file tax returns with inflated income figures. This had the effect of increasing Nexray's tax liability. Because the tax loss could not be estimated at the time of the plea agreement, the Government did not include the amount in

---

[2] The payments from Nexray to Pierre grossly exceeded the amount of loan repayments and interest provided by the fraudulent funding agreement in any event.

the Guidelines calculation in the agreement. Based on Weiner's amended returns, however, Weiner's wife's mistakes largely and inadvertently reduced the negative effect of Weiner's scheme to defraud the IRS.

## Discussion

A sentence within the Guidelines sentencing range of 15 to 21 months' imprisonment is warranted, and not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, 18 U.S.C. § 3553(a)(2)(A); to afford adequate deterrence, § 3553(a)(2)(B); and to avoid unwarranted sentencing disparity, § 3553(a)(6).

## I. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Afford Adequate Deterrence

Weiner has pleaded guilty to a criminal conspiracy with *two* overlapping objects—to defraud healthcare insurers and to commit tax evasion. Either scheme, standing in isolation, would warrant jail time. These schemes in combination, however, readily warrant a sentence within the Guidelines sentencing range of 15 to 21 months' imprisonment.

### A. The Healthcare Fraud Conspiracy

New York's requirement that medical practices be in fact owned and controlled by medical professionals is not a legal formalism or the elevation of form over substance. It is part of a long-standing policy prohibiting lay ownership of medical practices, intended as a protection for the public against fraud and malpractice. *See Matter of Co-operative Law Corp.*, 198 N.Y. 479, 484 (1910); *People v. Woodbury Dermatological Institute*, 192 N.Y. 454 (1908).

New York state specifically vests insurance carriers with the right to conduct Examinations under Oath ("EUOs") and deny coverage if clinicians lie or fail to attend. These examinations are carriers' most powerful means of rooting out healthcare fraud schemes. *See Med. Soc. of State of N.Y., Inc. v. Levin*, 712 N.Y.S.2d 745, 750 (Sup. Ct. 2000), *aff'd sub nom. Med. Soc'y of State of New York, Inc. v. Levin*, 723 N.Y.S.2d 133 (2001) ("[B]y giving insurers the right to conduct examinations under oath, insurers and self-insurers will be given an effective tool to combat fraud and abuse" (internal quotation marks omitted)). Weiner further knew the importance of these EUOs. In 2012 and 2013, Liberty Mutual and Mid-Century Insurance both sued Weiner for allowing his practice to be controlled by a non-physician and detailed, among other things, false and misleading testimony about Yan Moshe provided by Weiner during EUOs. Rather than taking the oath seriously, however, Weiner embarked on a scheme with Bradley Pierre to continue lying to these same insurers.

During his EUOs with Liberty Mutual and Mid-Century Insurance in 2021 and 2017, respectively, Weiner repeatedly perjured himself about Pierre's role in Nexray. Among other things, Weiner perjuriously claimed:

- Pierre did not do any marketing for Nexray or take any efforts to refer patients to Weiner;

- Pierre did not assist Weiner in re-opening Nexray in 2016;

- Pierre was simply a "funder" for Nexray;

- Pierre and Weiner had a non-recourse loan agreement, whereby Pierre loaned Weiner money and Weiner agreed to repay Pierre only if insurance companies paid Nexray's claims; and

- Pierre had no role in introducing Weiner to Nexray's accountant, who participated in both the healthcare fraud and tax conspiracies.

These were bold and willful lies. As set forth in the emails and text messages discussed above, Weiner knew since *2015* that Bradley Pierre was using "runners" to send patients to Weiner's MRI facility. Indeed, Pierre was Weiner's sole means of procuring patients. In 2020, Weiner told multiple banks that the payments to Pierre were "fees paid to management to help run the practice" and included "the marketing costs necessary to maintain patient flow." (*See* Exhibits D and E).

Pierre likewise was not simply a "funder" for Nexray. Weiner referred to Pierre as his "practice manager" since 2014 and openly referred to fees paid to Pierre as "management fees" on loan applications to banks and tax returns. Weiner further knew full-well that Pierre was taking millions of dollars in "fees" in excess of what was permitted under their so-called "financing agreement." In the run up to trial, Weiner produced hundreds of pages of accounting records for Nexray, including detailed ledgers of all the payments to and from Nexray and Bradley Pierre's company, Medical Reimbursement Consultants ("MRC").

Indeed, Weiner and Pierre spoke openly about the sham arrangement. As Nexray attempted to secure additional loans, Weiner and Pierre agreed that to tell the truth to banks that Pierre's companies were not "funders" of Nexray:

Pierre:      Re: management fees. We're leaving the word "funding" out of the equation..

Weiner:    I responded [to a potential bank lender] that I do not own MRC [Pierre's company][.] But it can be construed as a mgmt company for loan purposes[,] Correct?

Pierre:      Correct!

Weiner:    I'm educable

Pierre:      The bank understands the relationship.

Weiner:    Ok good[.] Be nice to have that deal[.] I like consolidating loan

As a result of all these lies, during Weiner's plea allocution, Weiner admitted he "falsely minimized Bradley Pierre's role in my medical practice to facilitate the payment of claims" by Liberty Mutual and Mid-Century. (Plea Tr. at 19). Weiner further stated that he knew, and his attorney knew, that he was ineligible for reimbursement because of Pierre's role in his practice.

(*Id.* at 20 ("THE COURT: So are you saying that the attorney was aware that as a result of Bradley Pierre's role in your medical practice, that it was not lawful to obtain medical reimbursement from the insurance company? THE DEFENDANT: That's fair to say, your Honor.").

The Court has repeatedly observed that healthcare fraud schemes such as these are extraordinarily difficult to detect. A major reason for this is that clinicians lie under oath when questioned by insurers. Insurers have the tools to prevent the next Bradley Pierre. However, those tools are useless if clinics like Weiner believe that they can lie under oath and the only penalties will be civil suits. To be clear, Weiner's lies were wildly successful. He fraudulently billed Liberty Mutual and Mid-Century Insurance *for nearly a million dollars* before he was charged and arrested. As the Second Circuit have noted, "The sanctity of an oath is central to the sound administration of justice. An oath impresses on one's conscience the duty to testify truthfully." *United States v. Parse*, 789 F.3d 83, 118 (2d Cir. 2015). "Today, the need to punish perjurers—through contempt proceedings, criminal prosecutions, or both—is no less acute." *United States v. Daugerdas*, 867 F. Supp. 2d 445, 484 (S.D.N.Y. 2012), *vacated and remanded sub nom. United States v. Parse*, 789 F.3d 83 (2d Cir. 2015). The Court has the opportunity to send a message that lying during Examinations under Oath will result in jail time. Otherwise schemes just like these will continue.

The need to send a message to other defendants is particularly acute given that Weiner's practice of medicine not driven solely by his professional judgment and patient needs, but rather were persistently under the influence of Pierre's decision-making—a decision-making that had no regard for patient welfare at all, but solely the desire to generate billings for reimbursement by no-fault insurance providers.[3]

One of Pierre's mantras when it came to MRI reports was that "it's not just the scan, it's the read."  In other words, Pierre was not concerned with what the MRI scan showed; he cared about what the what the radiology report said. Radiology reports are the primary basis of justifying medical procedures and treatments for no-fault insurance claims, and Pierre bragged to a co-conspirator that he "got the best reads." Pierre's oft-repeated philosophy was "It's not the scan, it's the read." The mantra was not highlighting patient care; it was highlighting the maximization of no-fault insurance claims.

This persistent pressure from Pierre, and Weiner's repeated accession to it, is demonstrated in numerous text message exchanges between the two co-conspirators.

---

[3] The defendant's plea allocution did not include any admissions about falsifying or exaggerating patient injuries or their causes, and in this sentencing submission the Government is not contending that the defendant's radiology reports were materially false or misleading. That issue was the subject of competing proposed expert opinion prior to trial, *see* Dkt. 309, 314, 317, 331, 334, 342, 354; and the Government does not seek to reopen those disputes. However, even if the defendant's radiology reports were not materially false or misleading, the fact that he surrendered significant influence over the content of his reports and which medical doctors could produce them to Pierre, a layperson and a fraudster, is a significant public health and safety concern.

In 2017, Pierre and Weiner texted about the importance of the "reads" over the "scans"; Weiner's request for Pierre's permission for Dr. Barbara Moriarty to keep making radiology reports on spine MRIs; Weiner's commitment to prevent Dr. Moriarty from using the word "unremarkable" in radiology reports; and Weiner's commitment to write radiology reports in a way designed to "build business":

> Pierre:    Reads are IMPORTANT!
> It's not just the scan, it's the read..
> You need to find a young radiology and train him/her to read like you. This is a big brand we're building!
> No joke!
>
> Weiner:    That's the plan[.] Will take awhile[.] My exact thoughts
>
>   . . . .
>
> I'll keep looking by if Moriarty ok on spines I can handle most of the rest once Bronx online
>
>   . . . .
>
> Problem solve[.] She won't say unremarkable[.] Will word it so build business as discussed

In early 2018, Weiner reported to Pierre on Weiner's progress in persuading Dr. Moriarty to change the way she wrote reports in response to Pierre's complaint that Dr. Moriarty's radiology reports were "kill[ing] the business"—that is, not leading to enough no-fault insurance claims and enough kickbacks to the referring physicians:

> Pierre:    . . . We cannot continue to send a lot if Barbara keeps reading. Doctors keep complaining
>
>   . . . .
>
> Weiner:    Spoke with Moriarty[.] Call me when free
>
> Pierre:    Ok[.] Barbara reads are going to kill the business[.] I lost 6 accounts thus far[.] Moy's even pulling back on his referrals[.] For now, can you cover until we figure this out?
>   . . . .
>
> Weiner:    Spoke to Moriarty[.] She gets it[.] I'll let her continue the current cases and I'll monitor[.] I'm confident it's be good
>
>   . . .
>
> Like I said reports will be tweaked to please as reasonably as possible

Despite Weiner's efforts to get Dr. Moriarty to "tweak" her reports to please Pierre, Pierre and his fraudulent referral network of doctors still were unhappy with their inability to make no-fault insurance claims from Dr. Moriarty's radiology reports:

Pierre:      People are complaining about Moriarty

Weiner:     I'm doing all the reads today and will for as long as necessary I'd like to visit w the docs and get some input[.] I've told her to study my reads and she can continue to evolve[.] She understood that I may have to stop using her

Pierre:      No—stop using her now

             She's going to kill us.

Weiner:     Ok

Pierre continued to push Weiner to change Dr. Moriarty's radiology report on a minor to generate reimbursable medical procedures:

Pierre:      We are in a very difficult business. A LOT of bullshit variables. BULLSHIT. I'm the FIRST to recognize this, but if we structure the right way, we won't have to deal with too many of these issues.

Weiner:     . . . . It's unlikely a 16 year old has much going on But I'll look . . . .

Pierre:      I don't get involved in clinical. I'm trying to put this project on "auto pilot" and move on to the next.. I've established the referral base, we're beyond busy, and clean paper. Now it's time to address my focus elsewhere. That's all that I'm trying to accomplish at this point. Thank you!

Weiner created an addendum to Dr. Moriarty's radiology report with findings more favorable to filing a no-fault insurance claim, and did not inform Dr. Moriarty that he had done so. Weiner ultimately fired Dr. Moriarty in 2020.

Likewise, below are excerpts of text message conversations in October 2017 between Pierre and Weiner about Dr. Mark Novick, another board-certified radiologist with decades of experience reading MRIs, who briefly worked for Weiner:

Weiner:     All good w new readers reports?

Pierre:      You're going to have to read EVERYTHING over when you get back! Don't pay that ASSHOLE either..

Weiner:     From Novick

             "What is the issue? Giving any and all pathology present. Not understanding." What do I say.

He's texting and calling Please call me

Weiner:    "Let's talk. On train now. Would love feedback. I gave each report a Proper honest read with accurate findings. Pathology where valid. Nothing made up. Always reported to reflect accuracy that can be demonstrated in a courtroom.["]

From Novick.

Thanks[.] Saw a few of his reports[.] Too black and white[.] Won't use him[.] Hard to stiff him in pay. . . .

In 2019, Weiner and Pierre texted about how to change the language in radiology reports to "better suit [the] needs" of attorneys: "We can speak directly to the attorney to see how the language can better suit his or her needs[.]"

In response to Pierre's complaints about radiology reports, Weiner also attempted to influence reports prepared by Dr. Mark Decker. Dr. Decker agreed to make his reports "lengthier with more fluff," but refused to change his findings. Weiner, still dissatisfied with Dr. Decker's reports, sent a text to Dr. Decker and a second radiologist stating that, among other things, "I have to run a practice[.] I'm losing cases to competition[.] For these short quickly [sic] reports I am overpaying I expect immediate improvement[.]" Weiner forwarded his text to Pierre.

Weiner later sent a follow-up email to Dr. Decker and the second radiologist that their reports "continue[] to erode my competitive advantage." Weiner reduced the rate he paid the two doctors for radiology reports, and also sent a series of Weiner's own reports as well as Dr. Decker's prior reports marked up with Weiner's comments and questions, apparently prodding Dr. Decker to make more findings of inflammation, among other things.

Dr. Decker responded forcefully in a reply email:

your comments make absolutely no sense

i ran them by several real radiologists whom all agreed this is ridiculous and the reports are detailed and complete

. . . .

if there was inflammation it would say inflammation

i needed to do this because i felt like i was in the twilight zone looking at the cases you selected and the comments you made

good luck in the future and i hope you find some plaintiff radiologists to help you moving forward

may your sites flourish and best of luck on your new adventures

Weiner then sent a text to Pierre: "I got rid of Decker[.]"

## B.  The Tax Evasion Conspiracy

Tax fraud is theft from the pockets of every taxpaying citizen of this nation. The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income taxlargely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes. As Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society. . . ." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, *J.*, dissenting).

During the course of the tax evasion scheme, Weiner either falsely reported as business expenses or failed to report at all nearly *a million dollars in income*. What sets his crimes apart from other tax cheats, however, is the complexity of the scheme. This is not an instance where a defendant simply failed to report income. This was a sophisticated, multi-year scheme to falsely classify personal expenses as business expenses. Moreover, the nature of the scheme made is extraordinarily difficult to detect. Weiner hid his personal expenses in legitimate-sounding categories such as "machinery rental," "business and advertising," "medical supplies," and "job site." Moreover, Weiner comingled illegitimate personal expenses with legitimate business expenses. This made the scheme virtually impossible to detect by the IRS.

To be clear, Weiner was aware of the full extent of the scheme. As described above, Weiner agreed with Pierre and their mutual tax preparer, Albert Haft, to falsify Weiner's and Nexray's tax returns. As they approached the tax filing deadline for 2017, Weiner texted Pierre a series of business income and expenses such as medical billing, office and postage, payroll taxes, supplies, utilities, and "sundry" which all were "to be determined pending your feedback." Weiner asked for Pierre's figures "from your notes" because "Albert's list was padded for deductions not true costs." Weiner also texted Pierre to notify him that Weiner was charging personal expenses to Nexray:

> Weiner:   Printed 32 pages 2017 Amex. 57 k on my card some was business most personal 27 on Lois most personal. I'll get exact by Monday. Chase card next
>
> Pierre:   No need for Chase car[d]s. I have the year end statement. Thanks for your time!
>
> Weiner:   No worries. *This way can accurately assess real expenses*

(emphasis added). Pierre needed to know Nexray's real income and expenses, as opposed to Nexray's reported income and expenses on tax returns, because of Pierre's ownership or control interest in the business.

Weiner and his wife similarly openly discussed that they were using the business to pay personal expenses, which only ended in April 2020:

Wife:     We were transferring $15,000 [t]o expense account a month I stopped that in April

Weiner:   Ok

Weiner likewise kept meticulous records of Nexray's expenses and knew the extent of the tax evasion scheme. As previously noted, Weiner produced hundreds of pages of accounting records for Nexray in advance of trial. The records included detailed calculations of the money going to and from MRC. They also contained excerpts of QuickBooks entries, including entries showing that Weiner was falsely categorizing his family's country club member as "Advertising and Promotion." An excerpt is below.

4:02 PM
07/22/19
Accrual Basis

**Nexray Medical Imaging PC**
**Custom Transaction Detail Report**
January through December 2018

| Type | Date | Num | Name | Account | Split | Debit |
|------|------|-----|------|---------|-------|-------|
| **INWOOD** | | | | | | |
| Check | 01/31/2018 | 1248 | INWOOD | Valley National Bank | Advertising an... | |
| Check | 01/31/2018 | 1248 | INWOOD | Advertising and Pro... | Valley National... | 1,173.15 |
| Check | 01/31/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 01/31/2018 | | INWOOD | Advertising and Pro... | Valley National... | 3,246.70 |
| Check | 02/28/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 02/28/2018 | | INWOOD | Advertising and Pro... | Valley National... | 2,682.45 |
| Check | 03/31/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 03/31/2018 | | INWOOD | Advertising and Pro... | Valley National... | 3,343.82 |
| Check | 04/30/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 04/30/2018 | | INWOOD | Advertising and Pro... | Valley National... | 4,303.31 |
| Check | 05/31/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 05/31/2018 | | INWOOD | Advertising and Pro... | Valley National... | 4,732.00 |
| Check | 06/30/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 06/30/2018 | | INWOOD | Advertising and Pro... | Valley National... | 9,049.67 |
| Check | 07/31/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 07/31/2018 | | INWOOD | Advertising and Pro... | Valley National... | 5,616.67 |
| Check | 08/31/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 08/31/2018 | | INWOOD | Advertising and Pro... | Valley National... | 5,479.74 |
| Check | 08/31/2018 | 1331 | INWOOD | Valley National Bank | Advertising an... | |
| Check | 08/31/2018 | 1331 | INWOOD | Advertising and Pro... | Valley National... | 1,000.00 |
| Check | 09/30/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 09/30/2018 | | INWOOD | Advertising and Pro... | Valley National... | 4,788.46 |
| Check | 10/31/2018 | | INWOOD | Valley National Bank | Advertising an... | |
| Check | 10/31/2018 | | INWOOD | Advertising and Pro... | Valley National... | 4,074.02 |
| Check | 12/31/2018 | 1040 | INWOOD | Nexray 2 | Advertising an... | |
| Check | 12/31/2018 | 1040 | INWOOD | Advertising and Pro... | Nexray 2 | 3,575.27 |
| **Total INWOOD** | | | | | | 53,065.26 |

Weiner likewise texted Bradley Pierre in 2019, "Let's calmly go over everything with the books when we meet I'm not insatiable I'm not greedy but want to examine everything and see what we can do to satisfy everyone."

As a result of Weiner's overstatement of business deductions alone, Nexray's income was fraudulently reduced by almost $1,000,000. Weiner's own proposed expert concluded that the fraudulent business deductions totaled approximately $913,000. *See* Weiner Sent. Mem. Ex. 7 ¶ 6. Weiner's expert nonetheless contends—with no basis—that "I do not believe Dr. Weiner knew that these amounts [of profits distributed to Pierre classified as management fees] had been

inflated." This is flatly contradicted by Weiner's detailed records of payments to and from MRC, as detailed above.

Furthermore, Weiner is not entitled to leniency because his wife and his co-conspirator, Albert Haft, separate and apartment from the criminal conspiracy, made mistakes on Nexray's tax returns that largely wiped out Weiner's attempts to defraud the IRS. This is the equivalent of giving a bank robber leniency because the bank happened to be out of money on the day of the robbery. The simple fact is that Weiner made a conscious and deliberate choice to cheat the U.S. government through a sophisticated scheme. Year after year, for nearly half a decade, the defendant made a willful decision to cause the filing of false corporate tax returns. This prolonged and serious criminal conduct warrants a term of incarceration within the Guidelines Range.

Indeed, promoting respect for the law and general deterrence are particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. For example, an IRS study of tax compliance estimates that only 83.6% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $441 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2011-2013," September 2019, *available at* https://www.irs.gov/pub/irs-pdf/p5364.pdf. This means that hundreds of billions of dollars are lost every year because of tax cheats like the defendant—who choose to shirk their responsibilities as taxpayers but otherwise fully enjoy the myriad public benefits that the tax system supports.

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a *primary consideration* underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt (emphasis added). Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

The need for general deterrence is at its peak in tax fraud cases, which are lucrative, easy to perpetrate, and difficult to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-

Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

In an effort to escape accountability for his crimes, the defendant requests a sentence of probation. The Government respectfully submits that such a sentence would not only fail to reflect the seriousness of the defendant's multifaceted crimes, but also fail *entirely* to serve the goal of general deterrence. The message that would be sent to others by such a sentence is that a multi-year, sophisticated tax fraud is well worth the risk. Such a sentence would provide a would-be tax cheat every incentive to commit tax crimes—the reward is high, the chance of being caught and successfully prosecuted is very low, and the punishment in the unlikely event of a successful prosecution is minimal (probation and the requirement to pay back the stolen money, which should have been paid to the Government in the first place). Respectfully, that is not the message that this sentence should send to the public. As Your Honor noted in a case involving a defendant who had an undeclared Swiss bank account and caused hundreds of thousands of dollars of tax loss, resulting in a Guidelines range of 24 to 30 months:

> Our tax system is, at bottom, a voluntary one. Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct. I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment. There's nothing about the facts here that suggest to me that a different outcome is appropriate.

*United States v. Werdiger*, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50). Where, as here, the defendant's tax evasion went hand-in-hand with his use of the shell companies to facilitate the health care fraud scheme, the totality of the defendant's conduct merits a Guidelines Sentence. Sentencing the defendant to a term of incarceration is, therefore, necessary to promote respect for the law and to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes will be met with serious punishment.

### C.  The Need to Avoid Unwarranted Sentencing Disparities

Lastly, the need to avoid unwarranted sentencing disparities further supports a sentence within the Guidelines sentencing range of 15 to 21 months' imprisonment. On June 3, 2024, the Court sentenced codefendant Jean Pierre to 15 months' imprisonment. Jean Pierre plead guilty to one count of filing false corporate tax returns, in violation of Title 26, United States Code, Section 7206(1), and had a Guidelines sentencing range of 12 to 18 months' imprisonment.

Weiner is more culpable than Jean Pierre for several reasons. First, although Jean Pierre was responsible for paying Rose, Prime, and others for illegal patient referrals, Jean Pierre did not know the full extent of the scheme. As the Government's sentencing submission made clear:

To be sure, it is unclear whether Jean Pierre knew the full extent of Bradley Pierre's healthcare fraud and bribery conspiracy. However, Jean Pierre's communications with Bradley Pierre make clear that Jean Pierre was running one of Bradley Pierre's clinics, was regularly paying large quantities of cash to runners in return for patient referrals, and was well aware of Bradley Pierre's managerial role within Rutland.

(D.E. 420 at 3). Weiner, on the other hand, knowingly played a significant role in the healthcare fraud scheme. He lied under oath to insurers multiple times because, as he admitted during his plea allocution, he and his attorney knew that he was ineligible for reimbursement because of Bradley Pierre's role in his practice. As set forth above, Weiner paid Bradley Pierre for referrals *knowing* that Pierre was using runners, entered a phony "loan" arrangement with Pierre, and openly admitted to banks and the IRS that Pierre was a "manager" of Nexray. As a result of Weiner's perjury, he pocketed nearly *a million dollars* from Liberty Mutual and Mid-Century Insurance before he was charged and arrested. This is far more than Jean Pierre made from the scheme.

Moreover, Weiner's tax evasion scheme is comparable to Jean Pierre's scheme when taken as a whole. Had Weiner been successful, he would have defrauded the IRS of more money than Jean Pierre— approximately $278,800 versus $220,000.[4] Weiner's scheme lasted for two years longer than Jean Pierre's scheme—2016 to 2020 versus 2017 to 2019. Furthermore, although Jean Pierre agreed to a sophisticated means enhancement for using shell companies and structuring financial transactions, Weiner's scheme was likewise incredibly hard for the IRS to detect. Weiner falsely classified personal expenses—including his family's country club membership, season tickets to the Mets, luxury vacations and cruises around the world, clothing from Bloomingdales, and fine wine—as no less than six different phony business expenses including "Equipment Rental," "Cost of Goods Sold," "Machinery Rental," "Advertising," "Medical Records and Supplies," and "Job Site." To use the Court's words from Jean Pierre's sentencing, classifying these personal expenses as business expenses was "flagrantly illegal." But by hiding personal expenses under legitimate, business-related titles, Weiner made it virtually impossible for the IRS to untangle the scheme by examining Nexray's returns. It took years of investigation—including dozens of subpoenas, witness interviews, and cooperating Weiner's tax preparer—to uncover the full extent of the fraud.

All of these factors warrant a sentence within the Guidelines sentencing range of 15 to 21 months' imprisonment, which reflects that Weiner's offense conduct is more serious than that of Jean Pierre.

* * *

---

[4] The $278,800 figure is calculated by multiplying the gross underreported income by 34% pursuant to U.S.S.G. § 2T1.1, Note B (" If the offense involved improperly claiming a deduction or an exemption, the tax loss shall be treated as equal to 28% of the amount of the improperly claimed deduction or exemption (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made").

       In sum, the nature and seriousness of the offense and the need to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, warrant a sentence within the Guidelines sentencing range of 15 to 21 months' imprisonment.


Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


by: _____ /s/ _____
    Mathew Andrews / Qais Ghafary /
    Michael D. Lockard
    Assistant United States Attorneys
    (212) 637-6526 / -2534 / -2193


cc:    Defense counsel (by ECF)