

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 9, 2024

**BY ECF**

Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States v. William Weiner*,
              22 Cr. 19 (PGG)

Dear Judge Gardephe:

      The Government respectfully writes with respect to the hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), scheduled for August 13, 2024.

      The Government and counsel for the defendant have engaged in substantial discussions in order to streamline the issues and presentation of evidence at the hearing, including factual proffers by both the Government and the defense. In light of these discussions, and the parties' respective sentencing submissions, the Government does not intend to call witnesses to testify at the hearing.

      The Court ordered the hearing to address various disputes raised in the parties' sentencing submissions, which fall generally in three categories: first, the extent to which Weiner knowingly conspired to falsely claim personal credit card expenses as deductible business expenses; second, the extent to which Weiner attempted to influence MRI reports prepared by other physicians; and, third, the extent to which the loan agreement between Nexray Medical Imaging ("Nexray") and Medical Reimbursements Consultants ("MRC") was a genuine financing agreement or was a sham agreement concealing Weiner's and Bradley Pierre's true business relationship. *See generally* D.E. 438 (June 12, 2024, Tr.) at 2-7.[1] As a result of the parties' discussions, the government no longer contends that the Court should consider the first and second issues when imposing sentence on Dr. Weiner.

      Below, the Government seeks to clarify the factual issues as we understand them and to outline the ways in which the scope of factual disputes has narrowed.

---

[1] Each of these issues relate to the Court's consideration of the factors pursuant to 18 U.S.C. § 3553(a), but do not impact the calculation of the sentencing range under the United States Sentencing Guidelines ("U.S.S.G.").

Personal expenses claimed as deductible business expenses. The controlling information charges Dr. Weiner with conspiracy to defraud the IRS and identifies as overt acts, "For tax years 2017 through 2019, WEINER filed U.S. Income Tax Returns for an S Corporation, IRS Forms 1120S, for Nexray Medical Imaging and U.S. Individual Income Tax Returns, IRS Forms 1040, for himself and his wife that he knew contained materially false statements." At his plea allocution, the defendant admitted to knowingly filing tax returns that contained improper deductions for personal country club and automobile expenses. *See* D.E. 385 (January 14, 2024 Tr.) at 19, 21-23. Weiner's sentencing submission likewise identifies payments for Weiner's country club membership and his personal car lease payments as personal expenses that were falsely deducted as business expenses. *See* D.E. 418 ("Weiner Sent. Mem.") at 1, 5-6.

The defendant's country club fees were claimed as deductible business expenses under the category "advertising and promotion."[2] Nexray's amended tax returns for 2016-2020 eliminate all but $9,000 of previously claimed advertising and promotion expenses, or a total of $123,862 in country club expenses. *See* Govt. Sent. Mem. Exs. F – J. The defendant's car lease payments were claimed as deductible business expenses under the category "machine equipment and rental." Nexray's amended tax returns for 2016-2020 eliminate $56,139 of previously claimed machinery and equipment rental expenses, reducing the amount to $0. *See* Govt. Sent. Mem. Exs. F – J.

Pursuant to the plea agreement, Weiner prepared amended tax returns that corrected additional false entries in his and Nexray's initial returns, including false statements that Weiner asserts were not intentionally made. *See* Weiner Sent. Mem. at 12-13. In its submission, the Government identified personal credit card expenses and payments to MRC characterized as "management fees" as additional falsely claimed deductions. D.E. 427 ("Govt. Sent. Mem.") at 7-8. For purposes of sentencing, the Government no longer contends that Weiner knew that the management fees and credit card expenses were falsely claimed.[3] Accordingly, the Government believes there is no factual dispute regarding the tax offense for sentencing purposes requiring witness testimony.

Attempts to influence MRI reports by other radiologists. The parties have worked together in good faith to narrow the scope of any factual disputes related to the Government's contention that Dr. Weiner sought to influence MRI reports prepared by other radiologists in his practice. While some dispute remains over the meaning of certain documents, the significant investment of time and resources necessary to adjudicate these remaining factual disputes is far out of proportion to the distance between the two parties and to the relevance to sentencing of the evidence that might be adduced on this issue at a *Fatico* hearing. Moreover, at the end of the day, both parties agree that no doctor changed a medical report as a result of any communication with Dr. Weiner.

---

[2] As a result of the parties' discussions, the Government no longer contends that Dr. Weiner was involved in selecting the specific category of business expense used for this or any other deduction.

[3] The Government also notes, as discussed in the parties' sentencing submissions, that due to Nexray's reclassification of funds received from MRC from income to loan advances, the net tax loss for 2016-2020 according to the defendant's amended returns is approximately $58,924.

Accordingly, the Government withdraws its request that the Court consider this conduct under Section 3553(a).[4]

*The loan agreement between Nexray and MRC.* At his plea allocution, the defendant admitted to "falsely minimiz[ing] Bradley Pierre's role in my medical practice" in two examinations under oath "to facilitate the payment of claims." *See* Jan. 16, 2024 Tr. at 19. The defendant acknowledged conspiring with Pierre and with his then-attorney with respect to these false statements, *id*. at 20-21, and that the insurance companies would deny the insurance claims if Pierre's true role were disclosed. *Id*. at 21. In its sentencing submission, the Government identified the specific false claims that the defendant made: (1) Pierre did not do any marketing for Nexray or take any efforts to refer patients to Weiner; (2) Pierre did not assist Weiner in re-opening Nexray in 2016; (3) Pierre was simply a "funder" for Nexray; (4) Pierre and Weiner had a non-recourse loan agreement, whereby Pierre loaned Weiner money and Weiner agreed to repay Pierre only if insurance companies paid Nexray's claims; and (5) Pierre had no role in introducing Weiner to Nexray's accountant (who participated in both the healthcare fraud and tax conspiracies). *See* Govt. Sent. Mem. at 4. The Government stated that Weiner effectively sold his medical license to Pierre to conceal that Pierre in fact owned and controlled the radiology practice to which Weiner lent his name. Govt. Sent. Mem. at 1. In ordering a *Fatico* hearing, the Court noted the Government's argument. *See* June 12, 2024 Tr. at 2-3.

The Government does not contend for sentencing purposes that the defendant committed a substantive *Mallela* violation. Furthermore, there is no dispute between the parties that Weiner falsely stated that (1) Pierre did not do any marketing for Nexray or take any efforts to refer patients to Weiner; (2) Pierre did not assist Weiner in re-opening Nexray in 2016; and (3) Pierre had no role in introducing Weiner to Nexray's accountant (who participated in both the healthcare fraud and tax conspiracies).

As such, the sole disagreement between the Government and the defense regarding the defendant's false statements under oath is with respect to the loan agreement. The defendant contends that the loan agreement was genuine. The Government contends that the loan agreement is not genuine, but was a tool to create the impression that MRC was simply a funder of Nexray and to conceal the true business relationship between the defendant and Pierre.

At a *Fatico* hearing on this issue, the Government would call a summary witness to discuss Nexray's financial records and other documentary evidence. However, the Government respectfully submits that such testimony is unnecessary because the parties do not dispute the

---

[4] The Government continues to credit the assertions from Barbara Moriarty and Mark Decker that they felt pressure from Dr. Weiner to change MRI reports. The Government points to contemporaneous documentary evidence that it believes to support its position, including text messages between Dr. Weiner and Bradley Pierre. Dr. Weiner, for his part, believes that any insinuation that he wanted any radiologist to change the substance of a report was a gross misunderstanding. Dr. Weiner points to contemporaneous documentary evidence that he believes supports his position, including texts and emails between Dr. Weiner and Drs. Moriarty, Decker, and another radiologist, Dr. Patel.

authenticity of these records.[5] The parties only dispute the inferences that the Court should draw from the evidence. Accordingly, the Government does not intend to call a witness at a hearing. Instead, the documentary evidence that would be presented by the Government is as follows:

1. Differing Loan Agreements: the Government served subpoenas on Nexray and MRC for copies of the loan agreements. Nexray and MRC produced materially different documents. The loan agreements from Nexray and MRC are incorporated as Exhibits A and B, respectively. The loan agreement produced by Nexray, which was signed by Weiner but not Pierre, states that MRC would advance Nexray 40% of its bills to insurance companies. *See* Exhibit A ¶ 1.1. By contrast, the agreement produced by MRC, which was signed by Pierre but not Weiner, states that MRC would advance Nexray 35% of its bills to insurance companies. *See* Exhibit B ¶ 1.1.

2. Overpayments: Both versions of the loan agreements state that MRC would be repaid, at a maximum, twice the amount of its advance. *See* Exhibit A ¶ 1.5, Exhibit B at 1.5. Accordingly, under the version of the agreement produced by Weiner, if Nexray billed an insurance company $100, MRC would advance $40, and Nexray would be obligated to repay MRC up to $80 if the bill was paid.

   Bank records and other documentary evidence show, however, that Nexray paid MRC more than MRC's maximum fee. Based on Nexray's bank records, between 2017 and September 2020, Nexray paid MRC $2,770,479.96 in excess of either version of the loan agreement *See* Exhibit C at 1.

   Furthermore, in or about December 2023, Nexray produced handwritten ledgers in its possession, custody, and control in response to a Government subpoena. *See* Exhibit D. Based on Nexray's handwritten ledgers from 2018, Nexray received approximately $842,108.44 in deposits from MRC. *See* Exhibit D at 2. By contrast, Nexray paid MRC $2,796,199.01. *See id.* at 3. This is an excess of at least $1,111,982.13 under either version of the loan agreement.

   Similarly, based on Nexray's handwritten ledgers from 2019, Nexray received approximately $265,511.63 in deposits from MRC but paid MRC $3,394,552.39 *See* Exhibit D at 5-6. This is an excess of $2,863,529.13.

3. Text messages about Reviewing Nexray's Books and Records: On March 17, 2018, Weiner texted Pierre, "I went through check books w Lois and sent him line items[.] Hopefully ok[.] Being picky but hopefully resolved by tomorrow." *See* Exhibit E at 4. Similarly, on February 19, 2019, Weiner texted Pierre, "Let's calmly go over everything with the books when we meet I'm not insatiable I'm not greedy but want to examine everything and see what we can do to satisfy everyone." *Id.* at 6. Pierre

---

[5] The sole dispute regarding authenticity is whether the copy of the loan agreement produced by MRC is authentic. The only person who can answer that question is Pierre, who has meritorious Fifth Amendment claim if called by the Government as a witness.

    responded, "All good." *Id.* Likewise, on November 7, 2019, Pierre texted Weiner, "We need to have a meeting on Tuesday. I'm meeting with Albert on Monday to go over my numbers on our current deal. I want to meet with you on Tuesday to square up." *Id.* at 7. Weiner responded, "Let me know." *Id.*

4. <u>Tax Returns, Emails, and Text Messages Describing the Loan Agreement as a "Management" Agreement</u>: Nexray's tax returns for fiscal years 2017, 2018, and 2019 did not list payments from MRC as "loans." *See* Exhibits F at 2, G at 2, and H at 2. Instead, they list the payments as "Management Fees." *See* Exhibits F at 3, G at 3, and H at 3. Similarly, in 2018, 2019 and 2020, Haft sent several emails to Weiner containing Nexray's financial records. None of the documents describe payments from MRC as "loans." *See* Exhibits I at 3, J at 3, and K at 3-4. They instead describe the payments as "professional and management" or "management fees." *See* Exhibits I at 4, J at 4, and K at 5.

   In addition, in April 2019, Weiner applied for a loan from Bank of America and emailed Bank of America representatives, "Mr Haft can better explain the statement and how it's structured tax wise as well as fees paid to management to help run the practice." *See* Exhibit L.

   The following month, on May 4, 2019, Pierre texted Weiner, "Re: management fees. We're leaving the word 'funding' out of the equation.." *See* Exhibit M. Weiner replied, "I responded that I do not own MRC But it can be construed as a mgmtcompany [sic] for loan purposes Correct?" *Id.* Pierre responded, "Correct!" Afterwards, Weiner replied, "I'm educable," to which Pierre responded, "The bank understands the relationship." *Id.*

   Approximately a year later, in April 2020, Weiner sent an email to the First National Bank of Long Island stating that the "line item on the financial statement with respect to management fees encompasses the marketing costs necessary to maintain patient flow." *See* Exhibit N.

5. <u>Lack of Documentation</u>: Finally, the Government would show that in response to subpoenas, neither MRC nor Nexray produced documents or communications between the two companies that would be ordinarily incident to a loan agreement, such as what insurance claims had been submitted, for what insurance claims funds had been advanced, what insurance claims had been paid, what amount of loan principal had been paid, what amount of loan interest had been paid, or how much money remained owing to MRC. Similarly, neither company produced any documentation relevant to a management agreement, including an actual management agreement or any invoices or bills for management services. The absence of these records is not disputed by the parties.

    Accordingly, the Government respectfully submits that a live hearing is not necessary and the Government does not intend to call any witnesses for testimony, with the exception (as noted above) of a possible summary witnesses should one be required. The remaining factual disputes

Page 6

between the parties relevant for sentencing are limited solely to whether, among the defendant's other knowingly false statements at EOUs, he also falsely claimed that Bradley Pierre's company was simply a funder for Nexray pursuant to a non-recourse loan agreement. That dispute that is appropriately resolved based on the documentary record.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney for
        the Southern District of New York

By: _____/s/_____
    Mathew Andrews / Qais Ghafary /
    Michael D. Lockard
    Assistant United States Attorneys
    (212) 637-6526 / -2534 / -2193

cc: Counsel of record (by ECF)