

Mayer Brown LLP
1999 K Street, N.W.
Washington, DC 20006-1101
United States of America

T: +1 202 263 3000
F: +1 202 263 3300

mayerbrown.com

**Kelly B. Kramer**
Partner
T: +1 202.263.3007
kkramer@mayerbrown.com

August 9, 2024

**VIA ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     United States v. William Weiner, 22 Cr. 19 (PGG)

Dear Judge Gardephe:

      We write on behalf of our client, Dr. William Weiner, regarding his upcoming sentencing. As the Court knows, the parties have engaged in extensive, productive, good-faith discussions to resolve their differences.  As a result of the parties' efforts, the Government has abandoned many of the assertions that it made in its Sentencing Memorandum.  For example, for purposes of sentencing, the Government no longer contends that Dr. Weiner violated *Mallela,* pressured radiologists to exaggerate diagnoses; or filed tax returns that he knew to contain inflated management fees, improper personal credit card expenses, or misleading expense categorizations.[1]

      Nevertheless, one disagreement remains:  the Government contends that Dr. Weiner knew that the Finance Agreement between his company, Nexray Medical Imaging (Nexray), and Bradley Pierre's company, Medical Reimbursement Consultants (MRC), was a sham.  Dr. Weiner categorically rejects this contention.  As explained below, Dr. Weiner (Nexray) entered into the Finance Agreement in good faith, believing it to be legitimate.  He repeatedly sought to enforce the Agreement, but his efforts were frustrated, in part, by his accountant, Albert Haft, who entered more than $1 million in fake transactions into Nexray's books and records at Pierre's direction. Every one of those fake transactions made it appear as though Nexray owed MRC materially more than it actually did.

**DISCUSSION**

**I.    DR. WEINER ENTERED INTO THE FINANCE AGREEMENT IN GOOD FAITH, BELIEVING IT TO BE A LEGITIMATE NO-RECOURSE LOAN**

      By late 2016, Dr. Weiner had taken out more than $1.5 million in loans—loans that he personally guaranteed—to open Nexray.  He used these funds to purchase an MRI machine and other radiology equipment, to build-out his office space, and to pay for the many other expenses

---

[1]     As the Government stated in its Letter (ECF No. 452), only one of three previously-disputed issues remains to be resolved for purposes of sentencing.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including
Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership)
and Tauil & Chequer Advogados (a Brazilian partnership).

The Honorable Paul G. Gardephe
August 9, 2024
Page 2

associated with opening a state-of-the-art radiology office. However, like many other radiologists, he was in need of short-term financing to provide cash flow while awaiting payment from insurance companies—a process that could take months or years.

Pierre offered to provide that short-term funding. Dr. Weiner discussed the opportunity with his lawyer, Russell Friedman, who encouraged Dr. Weiner to move ahead. Friedman told Dr. Weiner that working with Pierre offered two benefits: (i) a dependable funding source; and (ii) access to the network of physicians who were also financed by Pierre. Friedman further assured Dr. Weiner that finance agreements were common, lawful, and legitimate.

Dr. Weiner thereafter directed Friedman to negotiate a funding agreement with Pierre's company. As the record reflects, Friedman dealt directly with Pierre's counsel, Eric Fader, who at the time worked at the Day Pitney law firm. *See* **Ex. 1** (Composite of Dx. E-02, E-03) at 3-6. Counsel negotiated the agreement over the course of four months (October 2016 to February 2017). *See id.* Friedman advised Dr. Weiner that the resulting agreement was the most doctor-friendly agreement that he had ever negotiated in that it obligated Pierre to advance to Dr. Weiner on a non-recourse basis 40% of his billings (not 35% of the billings, which Friedman claimed was standard).

Dr. Weiner's understanding of the Agreement is confirmed by a contemporaneous email that he sent to his brother, a practicing lawyer. *See* **Ex. 1** at 1. As that email exchange reflects, Dr. Weiner asked his brother to review the agreement to ensure that it protected him. *See id.* His brother responded that it seemed straightforward, but that the interest rate was high. *See id.* Dr. Weiner explained that the 40% figure "was the factor," and that it had originally been set at 35%. *Id.* He further noted that Pierre would advance funds on a non-recourse basis. *See id.* Dr. Weiner had no reason to mislead his brother.

The Government infers that the Agreement was a sham in part because Pierre produced a version that only required him to advance 35% of Dr. Weiner's billings. *See* ECF No. 452 at 4. That is news to Dr. Weiner, who always understood that the Agreement provided for a 40% advance, as his email to his brother reflects. **Ex. 1** at 1. Moreover, in practice, there is no dispute that Pierre did, in fact, advance 40% of Dr. Weiner's billings.[2]

## II. DR. WEINER AMENDED THE FINANCE AGREEMENT TO ADDRESS PERSONAL GUARANTEES ON ADDITIONAL LOANS

By 2019, Dr. Weiner was preparing to open a second radiology office in the Bronx. In doing so, Dr. Weiner sought loans from radiology supply companies, like Siemens, for the

---

[2] The Government points to an alleged "lack of documentation" normally attendant with a loan agreement to supports its claim that Dr. Weiner knew the Finance Agreement was invalid. ECF No. 452 at 5. But Dr. Weiner employed billers to process payments. He reasonably relied on those billers—plus Friedman, his lawyer, and Haft, a CPA—to track both claims and the payments to and from MRC.

The Honorable Paul G. Gardephe
August 9, 2024
Page 3

purchase of an MRI machine and other equipment. Siemens and others were willing to extend such loans, but they expected that Dr. Weiner would guarantee them personally.[3]

Dr. Weiner was willing to make those guarantees, but the terms of the Finance Agreement caused him some concern. Specifically, under the Agreement, Pierre had certain rights over funds collected from insurers by collections counsel, which complicated Dr. Weiner's ability to access those funds to re-pay the radiology supply companies. To address this, Dr. Weiner retained Friedman to negotiate an amendment to the Agreement that would allow him to use escrowed funds to repay these companies. *See* **Ex. 2** (Dx. E-08). Dr. Weiner signed that amendment in March 2019.

Dr. Weiner also asked his brother to review the terms of the amendment. *See id.* Dr. Weiner did so because he trusted his brother's judgement, and because he was concerned about his personal exposure under the terms of the Agreement. Dr. Weiner would have had no reason to amend the Agreement or to seek his brother's input unless he believed it to be legitimate and binding.

### III.  DR. WEINER REPEATEDLY SOUGHT TO RECONCILE PAYMENTS

Nexray began operating in early 2017, but it was at first difficult to assess its financial results because insurance companies take months, if not years, to pay bills—if they pay them at all. Dr. Weiner asked Pierre to go over the financial statements to reconcile the amounts paid under the Agreement, but Pierre demurred, saying that it was too soon, because it would not make sense to undertake a reconciliation until they better understood which bills had, in fact, been paid by the carriers.

By 2019, Dr. Weiner had become concerned about the disparity between the amounts Pierre's company had advanced and the amounts that Dr. Weiner's company had repaid. In a text message cited by the Government, Dr. Weiner stressed that he wasn't greedy, but that he wanted to sit down to calmly review the numbers to make sure that they were correct. Pierre agreed to meet, but he always found excuses not to do so.

Dr. Weiner thereafter tried to enlist Haft's assistance. He asked Haft to provide an accounting of all monies paid between MRC and Nexray. The record does not reflect what Haft provided him, but it was clearly deficient. In a March 2020 email, Dr. Weiner complained: "This is close to useless. I'm sorry. Items duplicated. Headings confusing. *I don't know why you can't*

---

[3]  The Government alleges that Dr. Weiner told various banks that he had a "management agreement" with Pierre (ECF No. 452 at 5). It contends that these statements show that Dr. Weiner understood the Agreement to be a sham. Dr. Weiner concedes that his statements were inconsistent with his beliefs about the validity of the agreement. Dr. Weiner was misled by Pierre into believing this characterization was necessary to be considered for a loan by these banks. Dr. Weiner acknowledges that it was wrong to do so, but wishes to make clear that the loans Dr. Weiner did receive from any source other than MRC were personally guaranteed by Dr. Weiner and repaid in full.  It is undisputed that Dr. Weiner's statements about the nature of the Agreement injured no one.

Mayer Brown LLP

The Honorable Paul G. Gardephe
August 9, 2024
Page 4

*provide a simple total money in, money out, year by year for MRC to Nexray. Please. It's all in your quick books file.*" **Ex. 3 (**Dx. E-14) (cleaned up) (emphasis added).

Days after this email, COVID caused mass closures of businesses around the country and constrained personal mobility. Like countless others, Dr. Weiner spent most of COVID in isolation with his family. Still, he tried to facilitate a backyard meeting with Messrs. Pierre and Haft to discuss a reconciliation, but no such meeting ever happened. Dr. Weiner shared his frustration with his Office Manager, Steve Paleocostas. Mr. Paleocostas told Dr. Weiner that he needed to better understand the state of collections, and set up a meeting with Dr. Weiner's lawyers to assess Nexray's financial situation. *See* May 6, 2024 Letter from S. Paleocostas [ECF No. 418-7]. This confirmed Dr. Weiner's belief that Nexray had been overpaying MRC.

Dr. Weiner escalated his efforts to force a reconciliation of payments under the Agreement by involving his and Pierre's respective counsel. *See* **Ex. 4** (Composite of Dx. E-19 – E-24). As the emails reflect, that meeting was scheduled for February 2022—well before anyone was aware of the Government's investigation. As those emails further reflect, Dr. Weiner's concern was that Nexray had paid more money to MRC than was appropriate under the Agreement.[4]

## IV. ALBERT HAFT AIDED AND ABETTED BRADLEY PIERRE'S SCHEME TO DEFRAUD DR. WEINER

Discovery in this case revealed that Haft repeatedly made fictitious entries in Nexray's books and records that made it appear as though it had received more money from MRC than it actually had. As Haft told the Government, Pierre "instructed [him] via phone" to "adjust" Nexray's books through these fictitious entries. See IRS Mem. of Interview with Albert Haft (Aug. 9, 2022) [3543-0029]. As Haft further admitted, he knew that the entries (or "adjustments") were fictitious, and that their purpose was "to make [Nexray] appear to be in need of 'funding,' justifying [Pierre's] financial relationship" with Nexray. *Id.* Indeed, Haft told the Government that he "thought maybe Pierre was taking money from the medical practices" he purported to finance. Agent Notes of Interview with Albert Haft (Dec. 1, 2023) [3543-0023].

Dr. Weiner relied on—but was deceived by—these false entries. For example, as noted above, in March 2020, Dr. Weiner asked Haft to provide "a simple total money in, money out, year by year for MRC to Nexray." **Ex. 3** (Dx. E-14) (cleaned up). At the time, he did not understand why Haft could not (or would not) do so. In retrospect, it is clear that Haft did not want to provide these numbers because he knew that the Quick Books files were false and fictitious.

Similarly, in February 2021, after Dr. Weiner escalated the reconciliation discussion to counsel, he reviewed the financial information that Pierre provided. He then texted Pierre: "The

---

[4] Indeed, Dr. Weiner eventually sued MRC in state court in Nassau County to recover the amounts that he believed were owed to him pursuant to the Finance Agreement, which resulted in a settlement between the parties. *See Nexray Med. Imaging, P.C. v. Med. Reimbursements Consultants, Inc.*, Case No. 608566/2022 (N.Y. Sup. Ct.).

numbers that you submitted from the accountant had errors in my favor. Big time. I went through my records and the gap is way smaller. $800K smaller. I may be a pain but I'm honest." **Ex. 5** (Dx. D-06) at 6. Dr. Weiner was thus misled by the Haft's fictitious Quick Book entries when assessing the materials that Pierre submitted.

Dr. Weiner's reliance on the Quick Books entries is further confirmed by Dr. Weiner's email to his lawyers in June 2021. **Ex. 6** (Dx. E-25). In that email, which attached the Quick Books file, Dr. Weiner wrote, "attached is money financed and paid back between Nexray and MRC." Those records included more than $1 million in fictitious advancements from MRC *Id*. at 2-3 (fictitious entries highlighted by counsel). Dr. Weiner had no reason to tell his lawyers that MRC had advanced Nexray more than $1 million in excess of what it actually had – indeed, it would have been against Dr. Weiner's interest to do so. Dr. Weiner forwarded these records to his lawyers because he believed them to be accurate. As he now knows—but as Haft *always* knew—they were not.

V.     **HAFT FALSIFIED EVIDENCE REGARDING THESE ISSUES**

It is bad enough that Haft, a CPA, knowingly deceived his own client. What is still worse is that Haft has repeatedly altered and fabricated evidence throughout the investigation and prosecution of this case. Specifically, on January 11, 2024, the Government produced to the defense a Quick Books file for Nexray. When asked, the Government represented that the file had been maintained by Haft. We now know that Haft altered that file by making fictitious, back-dated entries in August 2022, November 2023, and December 2023.

Those entries were significant. As part of our recent discussions, the Government asserted that Journal Entry #35 supported a contention that Haft had made regarding Dr. Weiner's role in preparing Nexray's 2017 tax return. Undersigned counsel attempted to locate that Journal Entry in Dr. Weiner's copy of the Quick Books file, but it contained no such entry. Counsel thus asked Tom Bishop, a former IRS official and a retained expert, to examine the Quick Books file that the Government had produced in January 2024. That file did, in fact, contain Journal Entry #35. But Quick Books also contains an audit trail that allows a user to identify when particular entries were made. That audit trailed showed that Haft had not made the journal entry in 2017, as the Government understood. Rather, it showed that Haft made the journal entry in *August 2022*—two weeks after a meeting with the IRS in which he was unable to answer questions about Dr. Weiner's 2017 return and just one month before he entered into a cooperation agreement with the Government.

That piqued Mr. Bishop's curiosity. He examined the audit trail more closely. It showed that Haft made *multiple* journal entries in August 2022 (Journal Entries ## 30, 31, 32, 33, 34, and 35)—all of which altered years-old transactions, and many of which affected the MRC account (the account showing payments between Nexray and MRC). Further, the audit trail showed that Haft continued to change the Quick Books file in the run up to trial. Specifically, Haft made further changes to the file on November 26, 2023, and December 13, 2023. Again, many of the

changes went to the historical payments between Nexray and MRC. We believe that Haft falsified the Quick Books files to conceal his role in helping Pierre to defraud Dr. Weiner.

To be clear, we neither believe nor in any way contend that the Government knew that Haft had altered the Quick Books file. It too was deceived. Rather, we believe that Haft concealed this fact. Indeed, defense counsel only raises it now because it is relevant to show that Haft was and is capable of convincingly manipulating financial records in ways that are not easily detected. Haft's efforts to aid and abet Pierre's fraud frustrated Dr. Weiner's ability to understand the Finance Agreement and delayed his efforts to obtain a complete reconciliation.

*     *     *

In light of all of the above evidence, we submit that the only appropriate inference here is that Dr. Weiner was, like so many others, victimized by Pierre, and that Haft knowingly and intentionally aided and abetted that fraud.

## CONCLUSION

As the Court noted in ordering a *Fatico* hearing, the parties' sentencing memoranda painted starkly different pictures of Dr. Weiner's culpability. Since that time, the parties have engaged in extensive, substantive discussions of the evidence. The agreements they have reached largely track Dr. Weiner's submission.

As to the disputed issue, the question comes down to this: Did Dr. Weiner knowingly agree to overpay Pierre pursuant to a sham loan agreement? Or was Dr. Weiner defrauded—like everyone else who ever came into contact with Pierre? We respectfully submit that the evidence establishes that Pierre defrauded Dr. Weiner. And we submit that the evidence establishes that Pierre did so with the help of Haft, who, we now know, surreptitiously falsified Nexray's records—not just historically, but even after pleading guilty.

Dr. Weiner does not seek to minimize his conduct or to shirk responsibility for his deeds. But he is a decent man who has lived an honorable life. This case has not only shamed him, but it has ruined him financially and professionally. He alone among the defendants stands before the Court with remorse and humility. For the reasons set out in Dr. Weiner's Sentencing Memorandum, and consistent with the Probation Office's recommendation, we respectfully request that the Court impose a sentence of probation, enter the agreed order of forfeiture, and an award restitution in an amount to be determined.[5]

---

[5] Dr. Weiner has entered into a confidential settlement agreement with the Liberty Mutual Insurance Companies that resolves their disputes, including as to restitution. Thus, an award of restitution, if any, would relate only to the Mid-Century Insurance Company.

The Honorable Paul G. Gardephe
August 9, 2024
Page 7

Respectfully submitted,

*/s/ Kelly B. Kramer*
Kelly B. Kramer
*Counsel to Dr. William Weiner*

CC: All Counsel of Record